UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-82127-ALTMAN/Reinhart

**MATHEW INSKEEP**, *et al.*,

    *Plaintiffs*,

*v.*

**BACCUS GLOBAL, LLC**,

    *Defendant.*

_____/

## ORDER

For the twelve years between September 2008 and February 2020, Mathew Inskeep served as the managing member of Baccus Global, LLC ("Baccus"). He also set up The Consumer Group ("TCG"), a trademark holding company that licensed its marks exclusively to Baccus. But, in February 2020, the other members of Baccus staged a corporate coup, ousting Inskeep from his role as managing member.

On paper, Inskeep was listed as TCG's initial managing member, even though Baccus seeded the company, developed TCG's trademarks, and paid for the registration of those marks. Inskeep contends that, after his ouster, he terminated the license by which TCG had allowed Baccus to continue using TCG's trademarks. He also claims that he terminated Baccus's rights to one of Inskeep's own unregistered marks. When Baccus continued to use the marks, Inskeep says, he filed this lawsuit.

In their Complaint, the Plaintiffs (Inskeep and TCG) have asserted ten claims against Baccus: federal trademark infringement under the Lanham Act, 15 U.S.C. § 1117 (Count I on behalf of TCG and Count II for Inskeep); federal false designation of origin—also under the Lanham Act, 15 U.S.C. § 1125 (Count III for TCG, Count IV for Inskeep); federal unfair competition under the Lanham Act,

15 U.S.C. § 1125 (Count V for TCG, Count VI for Inskeep); common law trademark infringement (Count VII for TCG, Count VIII for Inskeep), and trademark infringement under FLA. STAT. § 495.131 (Count IX for TCG, Count X for Inskeep). *See* Complaint ("Compl.") [ECF No. 1] ¶¶ 55–152. After some protracted litigation—during which Inskeep passed away—the parties filed cross-motions for summary judgment, which we now resolve.

THE FACTS[1]

From September 2008 through February 2020, Mathew Inskeep was the managing member of Baccus, a limited liability company that markets and sells tools. *See* Baccus Articles of Organization [ECF No. 1-3]; *see also* Affidavit of Mathew Inskeep ("Inskeep Aff.") [ECF No. 105-1] ¶ 1 ("At all material times, I have been the managing member of Baccus Global, LLC[.]"). Five months after Inskeep formed Baccus, he—with the assistance of Baccus's general counsel, Jhan Lennon, *see* Plaintiffs' Motion for Partial Summary Judgment ("Pls.' MSJ") [ECF No. 106] ¶ 3—formed TCG "as an intellectual property holding company for Baccus" that "holds the trademarks" Baccus used, Deposition of Jhan Lennon ("Lennon Dep.") [ECF No. 112-6] at 45:3–12. From TCG's formation until 2020, Inskeep was consistently listed in public filings as TCG's manager or managing member. *See* TCG Articles of Organization [ECF No. 1-4] (reporting Inskeep as TCG's manager at the company's formation in 2008); *see also* TCG Ownership Documentation [ECF No. 1-19] at 4–10, 13–17 (reporting Inskeep as TCG's managing member on the company's annual reports from 2009 to 2020).

---

[1] "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, then, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

## I.      TCG's Trademarks

Since forming TCG, "Inskeep, in his capacity as sole Managing Member of The Consumer Group, has created and registered forty-four [ ] separate trademarks with the United States Patent and Trademark Office." Compl. ¶ 18; *see also* Trademarks List [ECF No. 1-5] at 1–2 (listing the trademarks held by TCG and Inskeep personally). Ten of TCG's trademarks are at issue here: BarFlex, Set It and Forget It, Power It, Jump It, Air It, On The Go Household Power, Satellite, AIRPRO 120, Tough Brite, and LCD IntelliScreen (collectively, the "TCG marks"). Each of these trademarks was registered with the U.S. Patent and Trademark Office ("USPTO") "by The Consumer Group at varying times between December 15, 2008 and April 7, 2017,"[2] Defendant's Statement of Material Facts ("Def.'s SOF") [ECF No. 102] ¶ 1—but none was registered "in any state registry," *id.* ¶ 24. TCG has never "allowed any person, association, or business other than Baccus [ ], its distributors, or its retailers to use the trademarks." Plaintiffs' Supplemental Responses to Defendant's First Set of Interrogatories, Sept. 29, 2021 ("Pls.' ROG Resps.") [ECF No. 102–3] at No. 4.

In 2012, Lennon "prepared a Trademark Licensing Agreement between The Consumer Group, LLC and Baccus Global," Affidavit of Jhan Lennon ("Lennon Aff.") [ECF No. 102-1] ¶¶ 3–4, which allowed "Baccus to have the exclusive use of [TCG's] trademark portfolio" until January 3, 2017, *see* Def.'s SOF ¶ 4; *see also* 2012 Licensing Agreement [ECF No. 1-18] at 1 (granting Baccus "exclusive right . . . to manufacturer [sic], market and otherwise commercialized the trademark portfolio" for a period of five years).

---

[2] For the Trademark Registration Certificates from the USPTO, see BarFlex Registration Application [ECF No. 1-6] at 6; Forget It Registration Application [ECF No. 1-7] at 6; Power It Registration Application [ECF No. 1-8] at 8; Jump It Registration Application [ECF No. 1-9] at 6; Air It Registration Application [ECF No. 1-10] at 7; On The Go Household Power Registration Application [ECF No. 1-11] at 8; Satellite Registration Application [ECF No. 1-12] at 7; AIRPRO 120 Registration Application [ECF No. 1-13] at 8; Tough Brite Registration Application [ECF No. 1-14] at 7; LCD IntelliScreen Registration Application [ECF No. 1-15] at 8.

When the agreement was set to terminate in 2017, Baccus's associate general counsel, Callie Hannan, "prepared the January 3, 2017 License Agreement in connection with [her] preparation of numerous other corporate documents designed to update records of Baccus Global, Baccus Worldwide, The Consumer Group and Vector Products." Affidavit of Callie Hannan ("Hannan Aff.") [ECF No. 102-2] ¶ 8; *see also* Lennon Aff. ¶ 5 ("Callie Hannan, at my direction, and Mathew Inskeep prepared a further five year license between The Consumer Group and Baccus Global in . . . early 2017."). Inskeep signed the 2017 Agreement as managing member of TCG, but he "did not date [T]he Consumer Group section of the draft agreement or sign and date the Baccus Global section of the draft agreement." Inskeep Aff. ¶ 7. According to Inskeep, he "never intended" this document to be executed and TCG "never intended to be bound by the 2017 License Document absent full execution." Plaintiffs' Response Statement of Facts ("Pls.' Resp. SOF") [ECF No. 114] ¶¶ 28–29. In Inskeep's view, therefore, he only "impliedly authorized" Baccus's continuing use of the TCG marks. Compl. ¶ 31.

## II.     The AUTOSTOP Mark

In 2016, TCG applied to register a new trademark, "AUTOSTOP," with the USPTO. *See* Pls.' Resp. SOF ¶ 32; *see also* Inskeep Aff. ¶ 19 ("I sought registration of 'AUTOSTOP' through my wholly-owned company [The] Consumer Group."). The product sought to "assist buyers and end-users in understanding any features whereby the user could set the desired pounds per square inch ('PSI') on a product and the product would stop automatically at the set PSI without the user needing to monitor the inflation process." Inskeep Aff. ¶ 17. On June 6, 2016, the USPTO "denied The Consumer Group's application to trademark the 'AUTOSTOP' language based on its purely descriptive nature." Lennon Aff. ¶ 11; *see also* Inskeep Aff. ¶ 20 (noting that TCG's 2016 registration "application regarding 'AUTOSTOP' was unsuccessful"). According to Inskeep, "[w]ith the 2016 USPTO registration application being unsuccessful, [he] held ownership of 'AUTOSTOP' in his individual capacity." Pls.'

Resp. SOF ¶ 34. Baccus has "extensively used and promoted the 'AUTOSTOP' mark . . . [since] at least as early as October 19, 2019." Lennon Aff. ¶ 9; *see also* Def.'s SOF ¶ 20 ("'AUTOSTOP' has been extensively used by Baccus on a number of its products since as early as October 19, 2019."); Pls.' Resp. SOF ¶ 20 ("Disputed. The testimony of Mr. Inskeep was that 'AUTOSTOP' was used by Baccus Global and the Consumer Group."); Deposition of Mathew Inskeep as Corporate Representative ("Inskeep 30(b)(6) Dep.") [ECF No. 50.1] at 124:25–125:3 ("Q. Did you believe that AutoStop was used by Baccus Global for a number of years prior to 2020? A. I believe it was. Under, I believe it was also under Consumer Group.").[3]

Four years after the initial denial, Inskeep tried (again) to register the AUTOSTOP trademark with the USPTO—this time in his individual capacity—by filing a new application on August 25, 2020. *See* AUTOSTOP Registration Application [ECF No. 1-16] at 1 (listing Mathew Inskeep as the owner of the mark); Composite Ex. A to Affidavit of Carl Spagnuolo [ECF No. 114-5] at 12 (noting that Inskeep applied for the trademark as an individual). In response, Baccus "filed a Notice of Opposition before the Trademark Trial and Appeal Board on April 22, 2021." Lennon Aff. ¶ 8. This application is still pending with the USPTO and is "currently suspended pending final adjudication of this instant action." Pls.' Resp. SOF ¶ 37; *see also* Pls.' ROG Resps. at No. 16 (describing the AUTOSTOP mark as "a trademark for which [Inskeep] had a [federal] application for registration pending").

### III.   Inskeep's Departure from TCG

The parties haven't provided us with a clear picture of the circumstances surrounding Inskeep's ouster from TCG in 2020. Here's what we do know. "[O]n some unknown date," Pls.' MSJ at 3, "allegedly . . . in January 2017," *id.* at 8, Baccus "prepared and back-dated" a stock certificate, which identified Baccus as the "100% owner" of TCG as of September 12, 2008, *id. at* 3; *see also*

---

[3] The dispute here seems to be about whether TCG *also* used the mark. But there's no dispute that Baccus has used the mark extensively since 2019.

Defendant's Response Statement of Facts ("Def.'s Resp. SOF") [ECF No. 112] ¶ 30 ("Hannan . . . filled out and Lennon signed the subject Consumer Group's stock certificate identifying Baccus Global as the 100% owner of The Consumer Group."). The stock certificate noted that Baccus "is the owner of one hundred [ ] units" in TCG. TCG Stock Certificate [ECF No. 1-22]. Lennon signed this certificate, *see* Lennon Dep. at 45:25 ("I signed the certificate."), and Hannan backdated it to September 12, 2008, *see* Deposition of Callie Hannan ("Hannan Dep.") [ECF No. 105-4] at 488:21–22 ("I believe that's my handwriting[.]"). This much the parties don't dispute. *See* Def.'s Resp. SOF ¶¶ 31–32 (not disputing that Hannan backdated the certificate or that Lennon signed it).

But the parties diverge on *why* the certificate was created. According to the Defendants, the stock certificate was prepared "[a]t Inkseep's direction . . . in connection with a clean up of Baccus related intellectual property." *Id.* ¶ 30; *see also* Jhan Lennon 30(b)(6) Representative Deposition ("Lennon 30(b)(6) Dep.") [ECF No. 112-1] at 211:4–10 ("Q. Who did Mr. Inskeep direct to do this? This stock certificate that you say he directed you to do. A. Directed me. Q. Anyone else? A. Well, there is Ms. Hannan's writing on it as well."). Inskeep's explanation was far more sinister. In his view, Ling To Shum (Baccus's then-President), Lennon, and Hannan "coordinated the creation of a fraudulent, backdated stock certificate," Compl. ¶ 40, as part of a "fraudulent conspiracy to wrestle control over and/or ownership of The Consumer Group and its intellectual property from Inskeep," *id.* ¶ 36.

Either way, on February 13, 2020, Shum, acting as Baccus's sole manager, unilaterally removed Inskeep from all TCG positions—and ousted him from his role as majority owner of Baccus. *See* Action by Unanimous Written Consent of Sole Owner [ECF No. 1-21] at 1 ("[Baccus Global] desires to remove Matthew [sic] J. Inskeep from the position of Manager and any and all other officers or roles he may hold or claim with respect to [TCG]." (cleaned up)). Baccus then filed an Amended Annual Report, which identified Baccus (not Inskeep) as TCG's Manager. *See* 2020 TCG Amended

Annual Report [ECF No. 1-20] at 1 (listing "Baccus Global LLC" as TCG's "Manager"). The next day, Inskeep "made a police report [against Baccus] regarding . . . trademark usage and theft." Pls.' ROG Resps. at No. 3.

According to Inkseep, any "license [for Baccus] to utilize the at-issue trademarks ended on February 13, 2020"—upon Inskeep's ouster from TCG. *See* Pls.' Resp. SOF ¶ 13; *see also* Def.'s SOF ¶ 14 ("The Consumer Group and Inskeep purport to have terminated Baccus'[s] license to use their claimed trademarks at issue herein effective February 13, 2020."). Baccus, for its part, maintains that the 2017 License Agreement remained operative after Inskeep's departure and insists that the agreement granted Baccus "full authorization and the exclusive right to use the trademarks through January 2, 2022." Defendant's Amended Motion for Summary Judgment ("Def.'s MSJ") [ECF No. 103] at 2.

### IV.    Our Procedural Posture

On November 19, 2020, the Plaintiffs filed this lawsuit, alleging that Baccus violated several federal, state, and common-law copyright laws through its purportedly unauthorized use of (1) TCG's trademarks, and (2) the AUTOSTOP mark. *See* Compl. ¶¶ 55–152. According to the Plaintiffs, "Baccus Global's authorization to use any trademark owned by [him] individually or by [his] wholly-owned company Consumer Group, including, but not limited to, 'AUTOSTOP' ended on February 13, 2020, when purported members of Baccus Global wrongfully sought to oust [him] from Baccus Global." Inskeep Aff. ¶ 24; *see also* Pls.' ROG Resps. at No. 3 ("The permitted usage ended with [Inskeep's] purported ouster from Baccus Global.").

Over the next year, the parties engaged in discovery, and, on November 10, 2021, both parties moved for summary judgment. *See* Defendant's First Motion for Summary Judgment [ECF No. 42]; Plaintiffs' First Motion for Partial Summary Judgment [ECF No. 47]. Unfortunately, while those motions were pending, Mathew Inskeep passed away. *See* Suggestion of Death of Plaintiff Mathew

Inskeep [ECF No. 82] at 1. Faced with this unexpected event, we closed the case for administrative purposes on April 26, 2022, pending the appointment of a personal representative who could represent Inskeep's estate. *See* Fourth Amnd. Scheduling Order [ECF No. 86] at 2. In doing so, we also denied without prejudice the parties' pending motions for summary judgment. *Id.* at 1. On August 25, 2022, Jennifer Inskeep, the wife of Mathew Inskeep, was substituted in as Personal Representative of the Estate of Mathew Inskeep. *See* Paperless Order Granting the Plaintiffs' Motion for Substitution [ECF No. 94]. We then reopened the case and resumed proceedings on September 8, 2022. *See* Order Reopening Case [ECF No. 98] at 1.

The parties have since refiled their motions for summary judgment. *See generally* Def.'s MSJ; Pls.' MSJ. Baccus asks for summary judgment on all counts arising from TCG's trademarks because (in its view) "the January 2, 2017 License Agreement reflects the granting of an exclusive right for Baccus to manufacture, market and otherwise commercialize The Consumer Group's trademark portfolio." Def.'s MSJ at 3; *see also id.* at 2 ("The existence of such license . . . eliminates The Consumer Group's Federal Trademark Infringement Clam under Count I, Federal False Designation of Origin Claim under Count III, Federal Unfair Competition Claim under Count V, Common Law Trademark Infringement Claim Under Count VII and State Trademark Infringement Claim under Count IX."). As to the counts relating to Baccus's use of the "AUTOSTOP" mark, Baccus says that "Inskeep has no basis for the[se] claims . . . [because] the 'AUTOSTOP' language has never been a registered trademark, Inskeep's attempt to register the mark in August 2020 was based solely upon an alleged intent to use the mark . . . and there is presently pending an opposition to Inskeep's effort to register 'AUTOSTOP' as a trademark." *Id.* at 1–2.

As to the TCG marks, the Plaintiffs say they've identified several genuine factual disputes relating to "the validity and enforceability of the 2017 License Document." Plaintiffs' Response in Opposition to Def.'s MSJ ("Pls.' Resp. MSJ") [ECF No. 115] at 4–5. As for the "AUTOSTOP" mark,

they claim that summary judgment would be "wholly improper because . . . there is certainly a genuine issue of material fact as to the ownership of 'AUTOSTOP' and whether Inskeep sought to exercise his personal rights relating to 'AUTOSTOP' [through TCG]." *Id.* at 9.

The Plaintiffs' Motion is more limited in its scope. In it, they ask us only to "enter summary judgment that Inskeep . . . owns The Consumer Group." Pls.' MSJ at 10. Baccus counters that it has presented "a myriad of evidence" about the corporate relationship between Baccus and TCG to dispute Inskeep's ownership claim and to survive summary judgment. *See* Defendant's Response in Opposition to Pls.' MSJ ("Def.'s Resp. MSJ") [ECF No. 111] at 1; *see also id.* at 4 ("Baccus has not simply presented an allegation that there might be facts showing its ownership rights but has provided clear evidence showing how and why its claim to ownership is supported in the record.") After careful review, and for the following reasons, we **DENY** the Plaintiffs' Motion for Summary Judgment in full and **GRANT in part and DENY in part** the Defendant's Motion for Summary Judgment.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always

9

bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

**ANALYSIS**

## I.      The Plaintiffs' Partial MSJ

The Plaintiffs ask for summary judgment on their claim that "Inskeep (now through his Estate) owns Consumer Group." Pls.' MSJ at 9. In their view, "there is no dispute that Inskeep owned Consumer Group as of its inception," *id.* at 8, and (they add) there are "no legal mechanisms or operative facts by which Inskeep transferred any of his 100% ownership of Consumer Group to Baccus Global," *id.* at 5. Baccus parries that "[t]he only existing ownership certificate reflects that Baccus is the 100% owner of The Consumer Group." Def.'s Resp. MSJ at 2; *see also* TCG Stock Certificate (noting that Baccus "is the owner of one hundred [ ] units" in TCG); Pls.' SOF ¶ 34 ("No other Consumer Group stock certificate exists." (citing Lennon Dep. at 29:24–30:7 ("Q.  How many certificates are executed to your knowledge in the Consumer Group corporate book? A. I only know of the one.")). We agree with Baccus on this one. In fact, despite the Plaintiffs' insistence that Inskeep has always been the sole owner of TCG, *see, e.g.*, Inskeep Aff. ¶ 1 ("At all material times, I have been the managing member of . . . The Consumer Group, LLC."); Pls.' SOF ¶ 1 ("Consumer Group was created by Inskeep." (citing TCG Articles of Organization)); *id.* ¶ 16 ("Consumer Group's annual report for 2022 identifies Inskeep as the sole managing member."), the evidence supports *three* possible ownership structures.

In Scenario One, Inskeep always had (and never lost) ownership of TCG. To support this view, the Plaintiffs introduce several documents reflecting Inskeep's control of TCG, including TCG's Articles of Organization (listing Inskeep as the founding "Manager" of TCG); TCG's Annual Reports from 2009 to 2020, *see* TCG Ownership Documentation at 4–9, 13–19 (listing Inskeep as the managing member of TCG); a 2018 bank filing, which showed Inskeep as TCG's sole "Beneficial Owner," *id.* at 25–28; and TCG's K-1 filings from 2011 to 2018, *id.* 18–24 (reporting that Inskeep owned "100%" of the shares in TCG). The Plaintiffs also point us to the testimony of at least two witnesses—Lennon

and Inskeep—who confirmed (at least in part) Inskeep's ownership claim. *See* Lennon Dep. at 28:19–22 ("Q. So [in] 2012, your understanding was Mr. Inskeep owned The Consumer Group[,] that's true, right? A. I believe so yes."); Deposition of Mathew Inskeep ("Inskeep Dep.") [ECF No. 46-1] at 31:9–11 ("Q. The Consumer Group is the owner of these trademarks that you're suing on, correct? A. I am the owner as Consumer Group.").

Scenario Two presents an opposite set of facts, in which Baccus *always* owned TCG. In support of this view, Baccus has introduced the statements of some of its employees. For example, Ling To Shum, Baccus's current managing member, testified that, in 2008, Inskeep told him: "The Consumer Group was owned by Baccus Global." Deposition of Ling To Shum ("Shum Dep.") [ECF No. 106-5] at 13:2–3; *see also id.* 98:17–18 ("Matt [Inskeep] told me Consumer Group is hundred percent owned by Baccus Global."). Ryan Powers, Baccus's President, echoed this sentiment in his own affidavit: "Inskeep," he said, "consistently represented that The Consumer Group was a wholly-owned subsidiary of Baccus Global[.]" Affidavit of Ryan Powers ("Powers Aff.") [ECF No. 112-2] ¶ 8. And there's nothing wrong with a party relying, at summary judgment, on the self-serving statements of its employees. *See, e.g.*, *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005) ("To hold that testimony under oath by an interested party cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment.").

But it's not just the testimony of Baccus employees. Some of the corporate filings likewise indicate that, at least at some point, Baccus controlled TCG. *See* 2020 TCG Amended Annual Report (listing Baccus as the sole manager of TCG); Banking Documents [ECF No. 1-26] at 3, 5, 12 (listing Shum as the manager of TCG). The Plaintiffs introduced those filings for their view that Baccus has engaged in a "fraudulent conspiracy to wrestle control over and/or ownership of The Consumer Group and its intellectual property from Inskeep." Compl. ¶ 36. But Baccus offers a reasonable (and competing) narrative: that, since TCG's "formation" around "2008, 2009," Inskeep repeatedly led

Baccus to believe "that The Consumer Group was wholly owned by Baccus Global." Lennon 30(b)(6) Dep. at 56:6–58:16. And this evidence—which supports Baccus's ownership claim—is sufficient, all on its own, to defeat the Plaintiffs' request for summary judgment. *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) ("Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." (citing *Rollins v. TechsSouth, Inc.*, 833 F.2d 1525, 1531–32 (11th Cir. 1987)).

Nonetheless, we'll take a moment to address Scenario Three—in which Inskeep owned TCG at some point but later transferred his ownership stake to Baccus. The Plaintiffs contend that Inskeep never relinquished control of TCG (at least not legitimately). *See* Pls.' SOF ¶ 38 ("There exists no document by which Inskeep's ownership interest in Consumer Group was transferred to Baccus Global."). Baccus sees things very differently. "[I]n or about 2018," it says, "[a]t Inskeep's direction, Callie Hannan, Baccus' Associate General Counsel, filled out and [Jhan] Lennon signed the subject Consumer Group's stock certificate identifying Baccus Global as the 100% owner of The Consumer Group in connection with a clean up of Baccus related intellectual property[.]" Def.'s Resp. SOF ¶ 30; *see also* Lennon 30(b)(6) Dep. at 207:9–11 ("Matt Inskeep . . . told me to prepare and sign this document.").

The parties spend a great deal of time fighting over this stock certificate. To the Plaintiffs, "[t]he Consumer Group Stock Certificate is not an operative document by which ownership interests and/or rights transferred." Pls.' SOF ¶ 37 (citing Letter from Jack A. Goldberger, Esq., to Kristi Alsup, Detective, Boca Raton Police Dep't (May 11, 2020) ("Goldberger Letter") [ECF No. 1-27] at 3). And it's undisputed that Lennon—not Inskeep—signed the stock certificate. *See, e.g.*, Pls.' SOF ¶ 32 ("The Consumer Group Stock Certificate was signed by Lennon."); Def.'s Resp. SOF ¶ 32 ("Baccus Global does not dispute the substance of [that] sentence . . . ."); *see also* TCG Stock Certificate (reflecting Lennon's signature). And the parties seem to agree that (at the very least) the stock certificate *purports*

to show that Baccus owns "100%" of TCG.[4] *See* Pls.' MSJ at 3 (agreeing that the certificate "purports to identify Baccus Global as the 100% owner of Consumer Group as of September 12, 2008" (citing TCG Stock Certificate (emphasis omitted)); Def.'s Resp. MSJ at 2 (arguing that the certificate "reflects that Baccus is the 100% owner of The Consumer Group").

The stock certificate obviously makes the Plaintiffs' summary-judgment arguments more difficult to sustain. Recognizing this, the Plaintiffs offer three reasons for their view that the stock certificate is (and always was) invalid. *One*, they say, because "Inskeep never signed the Fraudulent Stock Certificate . . . he cannot be legally bound" by it. Plaintiffs' Reply in Support of MSJ ("Pls.' Reply MSJ") [ECF No. 124] at 2; *see also* Pls.' MSJ at 8 ("[T]he Fraudulent Stock Certificate . . . is not signed by Inskeep, but curiously by Lennon." (citing TCG Stock Certificate)). *Two*, they claim that the stock certificate is "fraudulent [in] nature" because it "purports to be signed on September 12, 2008," Pls.' SOF ¶ 12, even though it was created by Hannan, who "did not become an employee [of Baccus's] until after 2015," *id.* ¶ 13 (emphasis omitted); *see also* Hannan Dep. at 99:16–17 ("I wrote Baccus Global on the line on . . . the certificate in [January] of [2017]."). *Three*, they contend that Baccus, in a letter from its lawyer, *conceded* that the stock certificate was invalid. *See* Pls.' SOF ¶ 16 ("Baccus Global, through its counsel Jack A. Goldberger, Esq., responded to the Boca Raton Police Department that the Fraudulent Stock Certificate is not operative."). We'll address—and reject—each of these three

---

[4] That both parties interpret the stock certificate in this way is crucial to our understanding of what they're *not* debating. Neither party believes that the stock certificate purports to grant Baccus "one hundred units" in TCG *in addition* to those owned by Inskeep. *See* TCG Stock Certificate (cleaned up); *see also* Pls.' SOF ¶ 30 ("[T]he document purport[ed] to be a Consumer Group Stock Certificate that identifies Baccus Global as the 100% owner of Consumer Group."); Def.'s Resp. SOF ¶ 30 ("[T]he subject Consumer Group's stock certificate identif[ies] Baccus Global as the 100% owner of The Consumer Group . . . ."). The parties' dispute, rather, seems to revolve around the certificate's *validity*. *See* Pls.' SOF ¶ 37 ("The Consumer Group Stock Certificate is not an operative document by which ownership interests and/or rights transferred." (citing Goldberger Letter at 3); Def.'s Resp. SOF ¶ 53 ("The circumstances of the preparation and execution of the stock certificate related to the *assignment* of patents and the cleaning up of trademarks." (emphasis added) (citing Lennon Aff. ¶ 14)).

arguments in turn. In doing so, we'll note that the Plaintiffs' frontal assault on the stock certificate's validity rests on two central assumptions: (1) that, for the certificate to be operative, Inskeep (not Lennon) had to sign it; and (2) that the certificate was the *only* way for Inskeep to transfer his shares in TCG. As we'll see, each of these assumptions is wrong as a matter of law.

### A.    There's a genuine dispute about Lennon's authority to bind TCG.

The Plaintiffs insist that Inskeep isn't bound by the certificate because he didn't sign it—and because Lennon (who did sign it) "cannot bind an individual member nor did he hold any member or manager role [through] which he could bind The Consumer Group." Pls.' Reply MSJ at 2; *see also* TCG Stock Certificate (showing that Lennon, not Inskeep, signed). But that's not necessarily true.

Under Florida law, a "transferrable interest [in a limited liability company] is personal property," FLA. STAT. § 605.0501, which may be transferred "in whole or in part" by its owner, *id.* § 605.0502. Where a limited liability company has only one member—as we'll assume was the case with TCG when the stock certificate was created[5]—the transfer is valid if *that member* consents to it, *see Olmstead v. F.T.C.*, 44 So. 3d 76, 81 (Fla. 2010) ("[A]n assignee of the membership interest of the sole member in a single-member LLC becomes a member—and takes the full right, title, and interest of the transferor—without the consent of anyone other than the transferor.").

---

[5] We're not sure *when* the stock certificate was created. Callie Hannan testified that the certificate was created in January 2017. *See* Hannan Dep. at 99:20–24 ("Q. And so, it's your testimony that in January of 2017 you wrote Baccus Global as the sole owner of The Consumer Group? A. I believe it was around that time, yes, and it appears to be my handwriting."). Lennon, in contrast, thought the certificate was drafted sometime "around 2018." Lennon Dep. at 29:9–10. And the Plaintiffs claim that "[f]or all [they] know it was signed after Inskeep's improper ouster to attempt to cause the exact chaos that has occurred with regard to The Consumer Group Trademarks in this case and provide Baccus Global a vehicle to continue to use The Consumer Group Trademarks." Pls.' Reply Statement of Facts ("Pls.' Reply SOF") [ECF No. 123] ¶ 8. At summary judgment, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party[.]" *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988). We'll therefore accept Baccus's view that the stock certificate was created while Inskeep was TCG's sole member. *See* TCG Ownership Documentation at 18–24 (reporting on federal tax forms that "Mathew Inskeep" owned "100%" of TCG in 2011–2018).

One way to do this would be for the company to issue a stock certificate. *See* FLA. STAT. § 605.0502(4) (noting that a "transferrable interest [in a limited liability company] may be evidenced by a certificate of the interest issued by the limited liability company in a record"). Inskeep contends that the stock certificate at issue in our case was invalid because Lennon didn't "hold any member or manager role [with] which he could bind The Consumer Group." Pls.' Reply MSJ at 2 (citing FLA. STAT. §§ 605.0301, 605.04074). But Lennon didn't have to be a member of the LLC to bind it. Under Florida law, a person may bind a limited liability company if "the person: (1) Is an agent of the company by virtue of § 605.04074; (2) Has the authority to do so under the articles of organization or operating agreement of the company; (3) Has the authority to do so by a statement of authority filed under § 605.0302; or (4) Has the status of an agent of the company or the authority or power to bind the company under a law other than this chapter." FLA. STAT. § 605.0301 (cleaned up).

Baccus has certainly created a genuine dispute about the extent to which Lennon satisfies the last (or fourth) prong—*i.e.*, whether, in signing the stock certificate, he "[h]a[d] the status of an agent of the company *or* the authority or power to bind the company under a law other than this chapter."[6] FLA. STAT. § 605.0301(4) (emphasis added). The disjunctive "or" in § 605.0301(4) makes clear that Lennon was authorized to bind the company if he *either* was "an agent of the company" *or* was qualified

---

[6] Although it didn't need to, Baccus has also created a genuine dispute as to whether Lennon had authority under an "operating agreement of the company." FLA. STAT. § 605.0301(2). While the record includes no evidence of a written operating agreement, *cf.* Lennon 30(b)(6) Dep. at 207:2–3 ("I don't know if I've ever heard there was an operating agreement with The Consumer Group[.]"), "a writing is not required to find that the owners have an operating agreement," Hank Jackson, *Anatomy of a Business Divorce: Florida LLCs*, 95 FLA. BAR J. 8, 9 (2021). Instead, an "operating agreement" is simply any "agreement, whether referred to as an operating agreement or not, *which may be oral, implied, in a record, or in any combination thereof*, of the members of a limited liability company, including a sole member, concerning [the activities and affairs of the company]." FLA. STAT. § 605.0102(45) (cleaned up & emphasis added). Which is all in the way of saying that, by directing Lennon to sign the certificate, *see* Lennon 30(b)(6) Dep. at 211:4–7 ("Q. Who did Mr. Inskeep direct to do this? . . . A. Directed me."), Inskeep may well have granted Lennon the authority to bind the company pursuant to an "oral" or "implied" operating agreement.

"to bind the company under a law other than this chapter." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items, while *or* creates alternatives."); *see also id.* at 149 ("With postpositive modifiers, the insertion of a determiner [in our case, this determiner takes the form of the article '*the*'] before the second item [here, this second item is the phrase 'authority or power to bind the company'] tends to cut off the modifying phrase so that its backward reach [*i.e.*, back towards the first item: 'status of an agent of the company'] is limited[.]"). And Baccus has adduced plenty of evidence for its view that Lennon was an agent of TCG.

For instance, Lennon signed the certificate as TCG's "Duly Authorized Agent." TCG Stock Certificate; *see also* Lennon 30(b)(6) Dep. at 213:19–20 ("I signed it as an authorized agent of The Consumer Group."). In fact, both Lennon and Hannan testified that Lennon was an authorized agent of TCG by virtue of his status as TCG's "secretary." Lennon 30(b)(6) Dep. at 213:21–22 ("Q. And that authorized agent was as secretary? A. I believe as secretary; yes."); Hannan Dep. at 489:4–6 ("It says 'duly-authorized agent,' and I believe in his capacity as secretary [Lennon] was a duly-authorized agent."). And that's unsurprising because Lennon had—over the years—filled out *other* legal documents (all binding on TCG) that required the signature of an "authorized" TCG representative. *See, e.g.*, TCG Ownership Documentation at 12 (showing that Lennon completed and signed TCG's Statement of Change of Registered Agent as an "authorized representative of a member"); *id.* at 25 (reporting that Lennon completed and signed a banking form that "[had to] be completed by an authorized individual representing [TCG]").

So, while we don't know precisely *when* Lennon became TCG's secretary, *see* Lennon 30(b)(6) Dep. at 199:25–200:2 ("I'm not sure. I just always remember acting as the secretary of The Consumer Group and the Baccus entities.")—or the full scope of his powers—we think a reasonable juror *could* find that, in signing the certificate, Lennon was acting as TCG's authorized agent, much as he had on

other prior occasions, *cf. Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (only where "no reasonable juror could find in [the non-moving party's] favor . . . [is] summary judgment . . . appropriate"). And, when we view the evidence in the light most favorable to Baccus, *see, e.g., Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) ("In examining the record, we view the evidence in the light most favorable to the non-moving party."), that's enough for us to deny the Plaintiffs' request for summary judgment, *see Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) ("If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment.").

### B.    The backdating didn't necessarily invalidate the stock certificate.

Signature aside, the Plaintiffs claim that the stock certificate is invalid because it "was created years after 2008 and back-dated to September 12, 2008." Pls.' SOF ¶ 31 (citing Hannan Dep. at 99:10–100:5); *see also* Def.'s Resp. SOF ¶ 31 ("Undisputed."). But the Plaintiffs never really explain *why* this is so. *See* Pls.' MSJ at 9 ("The alleged time frame of the creation and execution of the Fraudulent Stock Certificate does not, however, line up with the fact that Lennon, the Fraudulent Stock Certificate signor himself, submitted the beneficial ownership certification to BB&T in 2018, which properly identifies Inskeep as the 100% owner of Consumer Group . . . . Accordingly, the Fraudulent Stock Certificate does nothing to create an issue of material fact regarding the ownership of Consumer Group as it is entirely made up, back dated and admittedly inoperative.").

The fact is that Florida courts have been extremely reluctant to resolve backdating allegations (and their implications) at summary judgment. *See, e.g., McLagan v. Fed. Home Loan Mort. Corp.*, 145 So. 3d 943, 945 (Fla. 2d DCA 2014); *Vidal v. Liquidation Props., Inc.*, 104 So. 3d 1274, 1277 (Fla. 4th DCA 2013). As the Fourth District Court of Appeal has explained:

> [T]wo inferences can be drawn from the effective date language.  One could infer that ownership of the note and mortgage were equitably transferred [on the earlier date],

but one could also infer that the parties to the transfer were attempting to backdate an event to their benefit. Because the language yields two possible inferences, proof is needed as to the meaning of the language, and a disputed fact exists.

*Lloyd v. Bank of N.Y Mellon*, 160 So. 3d 513, 515 (Fla. 4th DCA 2015) (quoting *Vidal*, 104 So. 3d at 1277). As in *Lloyd*, the September 12, 2008, date on our stock certificate could mean one of two things.

*One*, it could mean that Baccus has owned TCG since 2008—and that the stock certificate was simply created to reflect this reality. And there's plenty of evidence in the record for this possibility. *See, e.g.*, Shum Dep. at 13:1–5 ("Q. Now you stated that Mr. Inskeep told you that The Consumer Group was owned by Baccus Global at the time you started Baccus Global is that true? A. Yes."); Powers Aff. ¶ 8 ("Inskeep consistently represented that The Consumer Group was a wholly-owned subsidiary of Baccus Global[.]"); Lennon 30(b)(6) Dep. at 214:7–8 ("[Inskeep] said we've got to clean up the paperwork and get the IP in its right places."). Even the Plaintiffs suggest that the purpose of the stock certificate was "to reflect the relationship between Consumer Group and Baccus Global." Pls.' SOF ¶ 36 (quoting Goldberger Letter at 3). In this plausible scenario, then, the certificate was properly (and legitimately) backdated as a way of memorializing Baccus's longstanding ownership of TCG. *Cf.* Jeffrey L. Kwall & Stuart Duhl, *Backdating*, 63 BUS. LAW. 1153, 1162 (2008) ("If the event occurred on the date stated in the document, the backdating memorializes[.]"); *see also United States v. Micke*, 859 F.2d 473, 478 (7th Cir. 1988) ("The . . . documents . . . had been executed in January, but backdated to December by defendant. The sole issue at trial was whether the deal had been agreed on in December, or subsequently in January. If the former, the backdating was legitimate and the returns were not fraudulent[.]"). Since we must, at summary judgment, view the evidence in the light most favorable to the non-movant—and draw all reasonable inferences in Baccus's (not the Plaintiffs') favor, *see Thomas*, 506 F.3d at 1363; *Pennington*, 261 F.3d at 1265—the plausibility of this first scenario is sufficient, all on its own, for us to deny summary judgment.

*Two*, the backdating could suggest that the "parties to the transfer" backdated the certificate

for some fraudulent purpose. *Vidal*, 104 So. 3d at 1277. This, of course, is the Plaintiffs' position. *See* Pls.' MSJ at 9 ("[T]he *Fraudulent* Stock Certificate . . . is entirely made up [and] back dated[.]" (emphasis added)). Two problems with this version of the story. *First*, we don't know who the parties to the transfer were because our parties hotly dispute whether Inskeep *himself* ordered Lennon to backdate the stock certificate. *Compare, e.g.*, Lennon 30(b)(6) Dep. at 211:17–20 ("Q. . . . Mr. Inskeep directed you to have this document filled out and signed? A. Yes."), *with* Pls.' Reply SOF ¶ 5 ("No where [sic] does it say that Inskeep made [Hannan] or Mr. Lennon prepare and execute the Fraudulent Stock Certificate."). *Second*, that Baccus may have intended to benefit from the backdating doesn't necessarily make it fraudulent (or improper). "[W]here the parties themselves agree that a contract between them should be given effect as of a specified date, *absent the intervention of third-party rights*, there is no sound reason why that agreement should not be given effect." 2 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 6:79 (4th ed. 2023) (emphasis added); *see also Mutual Life Ins. Co. of N.Y. v. Hurni Packing Co.*, 263 U.S. 167, 175–76 (1923) ("It was competent for the parties to agree that the effective  date of the policy should be one prior to its actual execution or issue; and this, in our opinion, is what they did."); *CAN Int'l Reins. Co. v. Phoenix*, 678 So. 2d 378, 380 (Fla. 1st DCA 1996) ("Generally, the parties to a contract are competent to fix the effective date.").

In our case, the parties never showed the certificate to any third parties or "used or presented [it] to any banks or regulatory bodies for any purpose." Def.'s Resp. SOF ¶ 37 (quoting Goldberger Letter at 3); Pls.' SOF ¶ 37 (claiming that the certificate "is, at most, an internal document"). If Inskeep authorized Lennon and Hannan to backdate the stock certificate, *see* Lennon 30(b)(6) Dep. at 211:4–11 ("Q. Who did Mr. Inskeep direct to do this? This stock certificate that you say he directed you to do. A. Directed me. Q. Anyone else? A. Well, this is Ms. Hannan's writing on it as well. He may have worked with her on it as well.")—and, at summary judgment, we must assume that he did, *see Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.9 (11th Cir. 1999) ("[At] summary judgment[,] we are required

to draw all inferences in favor of [the non-movant.]")—we see no third party whose rights *could've* been harmed. Either way, in other words, the Plaintiffs' backdating claims fall short.

### C.     Baccus didn't concede that the stock certificate was inoperative.

The Plaintiffs also claim that Baccus, though its attorney, conceded that the stock certificate "is not an operative document by which ownership interests and/or rights transferred." Pls.' SOF ¶ 37 (citing Goldberger Letter at 3). But Baccus has offered a plausible alternative reading of the letter— that it intended to clarify to the police that the stock certificate "had not been presented to anyone outside the Company contrary to Inskeep's arguments to the police." Def.'s Resp. MSJ at 5. And the letter, in fact, makes clear that "[t]he Ownership Certificate is simply an internal document prepared in the ordinary course of corporate record keeping to reflect the relationship between Consumer Group and Baccus Global. It was never used or presented to any bank or regulatory bodies for any purpose." Goldberger Letter at 3.

Far from suggesting that the certificate was invalid, in other words, the Goldberger Letter clarified its author's position that the certificate "reflects the relationship between Baccus and The Consumer Group and that The Consumer Group was intended to be wholly-owned by Baccus Global." Def.'s Resp. SOF ¶ 36. Again, this is nothing new. As we've shown, it's the view Baccus and its employees have consistently supported, with competent evidence, throughout this litigation. *See, e.g.*, Powers Aff. ¶ 8 ("Inskeep consistently represented that The Consumer Group was a wholly-owned subsidiary of Baccus Global and that the trademarks in question were Baccus Global's property"); Affidavit of Patrick Wright ("Wright Aff.") ¶ 7 ("Neither Mr. nor Mrs. Inskeep ever responded to [an external email with J.P. Morgan Chase & Co.] to state that The Consumer Group was not owned by Baccus Global."); Lennon Dep. at 45:3–4 (TCG was "set up as [an] intellectual property holding company for Baccus[.]"). And, as we've highlighted, the Plaintiffs have failed to show that Lennon *wasn't* authorized to effectuate Inskeep's intentions. We cannot agree, in short, that—by

sending this letter—Baccus disavowed the stock certificate's validity (or its ownership of TCG).

**D.    Baccus doesn't need a valid stock certificate anyway.**

Here's the thing, though: We would've denied the Plaintiffs' motion for summary judgment, *even if* they had managed to show that the stock certificate was invalid. Under Florida law, a "transferrable interest *may* be evidenced by a certificate of the interest issued by the limited liability company in a record, and, subject to this section, the interest represented by the certificate *may* be transferred by a transfer of the certificate." FLA. STAT. § 605.0502(4) (emphases added). The word "may" in this statute indicates that its language "is *permissive*, not mandatory[.]" *Cosgun v. Seabourn Cruise Line Ltd.*, 2023 WL 2660243, at *15 (S.D. Fla. Mar. 28, 2023) (Altman, J.); *see also* SCALIA & GARNER at 112 ("[P]ermissive words grant discretion. . . . The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive[.]"). Stock certificates are thus one (but by no means the only) way of transferring membership in an LLC from one person or entity to another.[7] *That* kind of flexibility

---

[7] This interpretation is further supported by the fact that an interest in a limited liability company is generally not treated as a "security." FLA. STAT. § 678.1031(3) ("An interest in a partnership or limited liability company is not a security unless it is dealt in or traded on securities exchanges or in securities markets, its terms expressly provide that it is a security governed by this chapter, or it is an investment company security. However, an interest in a partnership or limited liability company is a financial asset if it is held in a securities account."); *see also id.* § 678.1021(i)(1) (defining "financial asset" as "[a] security"). Unlike the flexibility it provides in the context of LLCs, Florida law sets out a comprehensive scheme for transferring securities, even if they're uncertificated. *See, e.g., id.* § 678.3011(2) ("Delivery of an uncertificated security to a purchaser occurs when: (a) The issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or (b) Another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser."). But the Florida Legislature elected *not* to include these (or any similar) requirements in the Florida Revised Limited Liability Act, and we will not do it for them. *See Smith ex rel. M.S. v. Crisp Regional Hosp., Inc.*, 985 F.3d 1306, 1309 (11th Cir. 2021) ("[W]e are not allowed to add words to or rewrite a statute."); *cf. Medellin v. Texas*, 552 U.S. 491, 521–22 (2008) ("The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress. . . . Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Savage Servs.*

makes sense given the Florida legislature's explicit desire that laws governing limited liability companies "give the maximum effect to the principle of freedom of contract." FLA. STAT. § 605.0111(1). And, in interpreting Florida law, we must effectuate that interest. *See* SCALIA & GARNER at 225 ("[I]nterpretation clauses are to be carefully followed.").

Lennon thus could have lawfully transferred Inskeep's TCG shares to Baccus—even if he wasn't an authorized TCG agent—so long as he had the authority to bind Inskeep *personally*. In the Plaintiffs' view, "Inskeep never signed the Fraudulent Stock Certificate, and, therefore, cannot be legally bound" by it. Pls.' Reply MSJ at 2. Nor (they say) was Lennon authorized to "bind an individual member." *Ibid.* But these assertions fly in the face of basic principles of agency.

It's a well-settled principle of agency law that acts "performed within the scope of [an agent's actual] or apparent authority, are binding upon his principal." *Beekman v. Sonntag Inv. Co.*, 64 So. 948, 953 (Fla. 1914); *see also* RESTATEMENT (THIRD) OF AGENCY § 6.01 cmt. b (Am. L. Inst. 2006) ("An agent has power to make contracts on behalf of the agent's principal when the agent acts with actual or apparent authority."). The "agent has 'actual' authority to bind the principal where the principal has specifically granted the agent the power to do so." *United States v. Schaltenbrand*, 930 F.2d 1554, 1560 (11th Cir. 1991) (citing H.G. REUSCHLEIN & W.A. GREGORY, AGENCY AND PARTNERSHIP § 14 (1979)). And apparent authority is "authority which a principal knowingly tolerates or permits, or which the principal by its actions or words holds the agent out as possessing." *Roessler v. Novak*, 858 So. 2d 1158, 1161 (Fla. 2d DCA 2003) (citing *Taco Bell of Cal. v. Zappone*, 324 So. 2d 121, 123 (Fla. 2d DCA 1975)). If, therefore, Inskeep had authorized Lennon to transfer Inskeep's TCG shares—and if Lennon effectuated that transfer by way of a valid contract, *see* RESTATEMENT (THIRD) OF AGENCY §

---

*Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) ("Congress, in short, knows how to waive sovereign immunity when it wants to. And, unfortunately for Savage, it chose not to include these well-hashed sovereign-immunity waivers in the OPA.").

6.01 cmt. b ("This power is consistent with the bargain principle in contemporary contract law under which 'the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'" (quoting RESTATEMENT (SECOND) OF CONTRACTS § 17(1) (Am. L. Inst. 1981))—he could've bound Inskeep with that transfer.

Taking the facts in the light most favorable to Baccus, we find a genuine dispute about whether Inskeep authorized Lennon to make the transfer. An actual-agency relationship is created by "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Atty's Title Ins. Fund, Inc. v. Regions Bank*, 491 F. Supp. 2d 1087, 1095 n.5 (S.D. Fla. 2007) (Ungaro, J.) (citing *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990)). Baccus claims that "Matt Inskeep told Jhan Lennon to prepare and sign the document." Def.'s Resp. SOF ¶ 51. And, while the Plaintiffs dispute this proposition, *see* Pls.' Reply SOF ¶ 5 ("There has been no cite to any documentary evidence that Inskeep requested Callie Hannan or Jhan Lennon to prepare the Fraudulent Stock Certificate."), some of the record evidence supports Baccus's view, *see* Lennon 30(b)(6) Dep. at 207:9–11 ("Matt Inskeep . . . told me to prepare and sign this document."); *see also* Lennon Dep. at 37:11–13 ("What [Inskeep] instructed me to do was to make sure that The Consumer Group was . . . a Baccus Global entity."). Given the "very fact-specific" nature of an agency relationship, *Garcy v. Broward Process Servers, Inc.*, 583 So. 2d 714, 716 (Fla. 4th DCA 1991), "[t]he existence of an agency relationship is ordinarily a question to be determined by a jury in accordance with the evidence adduced at trial," *Orlando Exec. Park Inc. v. Robbins*, 433 So. 2d 491, 494 (Fla. 1983). Baccus has therefore adduced enough evidence for a reasonable jury to find that Inskeep authorized Lennon to transfer his TCG shares to Baccus. *See Anderson*, 477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the

[nonmoving party].").[8]

Now that we've moved past the misconception that the transfer's viability depends on the stock certificate's validity, the Plaintiffs' arguments about backdating and the Goldberger Letter begin to lose their relevance. Whether Baccus took control of TCG on September 12, 2008, or on the day Lennon executed the transfer, is irrelevant to the Plaintiffs' Motion—which asks us to find that "Inskeep (now through his Estate) owns Consumer Group" *today*. Pls.' MSJ at 9 (emphasis omitted). Because Lennon could've had the authority to transfer Inskeep's shares independent of the stock certificate, we needn't fixate on the significance of the date listed on that certificate. *See, e.g., Gottlieb v. Constr. Servs. & Consultants, Inc.*, 2006 WL 8445921, at *1 (S.D. Fla. Jan. 17, 2006) (Graham, J.) ("A material fact is one that might affect the outcome of the case." (citing *Anderson*, 477 U.S. at 248)). For that same reason, the fact that the stock certificate "is simply an internal document prepared in the ordinary course of corporate record keeping to reflect the relationship between Consumer Group and Baccus Global," Pls.' SOF ¶ 36, doesn't foreclose the possibility that the shares were nonetheless transferred by other means.

---

[8] This scenario presents another outstanding issue—*viz.*, whether Inskeep was given consideration for his Baccus shares. Lennon testified that, although Inskeep "was an employee of Baccus Global, so he was . . . paid money [via salary,]" he wasn't sure "what else he received" for the shares. Lennon Dep. at 33:17–35:12. But we do know that Inskeep was paid "$1 million for Consumer Group trademarks" as part of the 2012 Licensing Agreement, which Inskeep chose to take "through compensation . . . in [his] salaries." Inskeep Dep. at 22:24–24:1. And, given that Inskeep "primarily determined" his own compensation at Baccus, *see id.* at 24:2–23 ("Q. You ultimately determined what you paid yourself, correct? . . . A. As a CEO and owner, yes, I ultimately determined what was paid."); *see also* Pls.' ROG Resps. at No. 2 ("Because of the use of the trademarks by [Baccus], I took such use into consideration when determining my overall compensation from Baccus Global."), Inskeep's compensation for the shares may well have been incorporated into the salary he decided to give himself. This issue thus presents a separate factual question for the jury to decide. *See, e.g., ConSeal Int'l Incorp. v. Neogen Corp.*, 488 F. Supp. 3d 1257, 1268 (S.D. Fla. 2020) (Bloom, J.) ("[T]he existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances." (cleaned up)); *Family Oriented Cmty. United Strong, Inc. v. Lockheed Martin Corp.*, 2012 WL 12898622, at *4 (M.D. Fla. May 23, 2012) (Moody, J.) ("Whether consideration existed is a fact issue that cannot be appropriately decided on summary judgment.").

25

Resisting this conclusion, the Plaintiffs offer three arguments—all unpersuasive—for their view that Inskeep (and only Inskeep) owned TCG. *First*, they say that, in a 2018 Beneficial Ownership Certification with BB&T bank, Lennon admitted that Inskeep owned 100% of TCG. *See* Pls.' MSJ at 9 ("Lennon . . . submitted the beneficial ownership certification to BB&T in 2018, which properly identifies Inskeep as the 100% owner of Consumer Group."); *see also* TCG Ownership Documents at 26–27 (listing "Mathew J. Inskeep" as the "Managing Member" and sole "Beneficial Owner" of TCG on the BB&T filing). The Plaintiffs also claim that Lennon "was involved in tax filings for Consumer Group," Pls.' MSJ at 9, which also list Inskeep as the "100%" shareholder of TCG as recently as 2018, *see* TCG Ownership Documents at 24.

But, even accepting that Lennon conceded Inskeep's ownership of TCG, the Plaintiffs still haven't shown that he was authorized to make that representation—just as they haven't told us *who* might have authorized him to say it or (even) that he was right. These are all questions the Plaintiffs simply ignore. In any event, Lennon's statement is, as we've seen, just one piece in a much larger puzzle. Whether—and to what extent—that statement outweighs all the evidence Baccus has adduced for its ownership claim is (fortunately) a question for the jury. *See Strickland*, 692 F.3d at 1154 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." (cleaned up)).

*Second*, misunderstanding the standard at summary judgment, the Plaintiffs question the credibility of certain witnesses who have attested that Baccus (not Inskeep) owned TCG. *See* Pls.' MSJ at 9. In the Plaintiffs' view, Baccus's "he-said-she-said" testimony—which includes evidence "that Inskeep *told people* that Baccus Global owned Inskeep's Consumer Group"—isn't "credible evidence capable of overcoming the wealth of evidence . . . to substantiate the fact that Inskeep owns Consumer Group." *Ibid.* Baccus has suggested that "numerous representations were made by Inskeep about Baccus' ownership of the trademarks held by The Consumer Group." Def.'s Resp. MSJ at 2. Shum,

for instance, testified that "Matt [Inskeep] told me from the beginning [TCG] belonged to Baccus." Shum Dep. at 7:21–22. Ryan Powers, Baccus's current President, likewise attested (by affidavit) that "Mr. Inskeep consistently represented that [TCG] was a wholly-owned subsidiary of Baccus Global and that the trademarks in question were Baccus Global's property." Powers Aff. ¶ 8. And Patrick Wright, Baccus's Vice President of Finance and Accounting, declared (again, by affidavit) that "[n]either Mr. nor Mrs. Inskeep ever responded" to an email (which they were copied on) sent by J.P Morgan Chase & Co. to "confirm the subsidiary or shared ownership status of . . . The Consumer Group" "to state that The Consumer Group was not owned by Baccus Global." Wright Aff. ¶¶ 5, 7. We understand that the Plaintiffs would prefer us to declare, without having met these witnesses or assessed their credibility, that this evidence isn't believable. But that's just not our job at summary judgment. *See, e.g.*, *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) ("We do not weigh conflicting evidence or make credibility determinations [at summary judgment]."); *Hairston v. Gainsville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) ("It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried.").

*Third*, the Plaintiffs point to Baccus's own damages expert as evidence that Inskeep owned TCG. *See* Pls.' MSJ at 9 ("Baccus Global's own expert witness testified that Inskeep owns Consumer Group[.]"). And Bryce Cook, Baccus's damages expert, *did* say that. *See* Deposition of Bryce R. Cook ("Cook Dep.") at 30:3–6 ("Q. From your review of the documents that you cited in your report, who owns the Consumer Group . . . ? A. Mr. Inskeep."). But, as Baccus points out, that's irrelevant because "Mr. Cook was retained as a damages rebuttal witness . . . . As a damages expert, it is a basic assumption that liability has to be established to move the focus to damages." Def.'s Resp. MSJ at 5. And that *is* the law. *See, e.g.*, *Fla. Virtual Sch. v. K12, Inc.*, 2023 WL 6294214, at *2 (M.D. Fla. Aug. 25, 2023) (Presnell, J.) ("[A] damages expert may generally assume that a plaintiff will prevail on each of its

separate claims when calculating actual damages." (cleaned up)); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *3 (S.D. Fla. June 8, 2011) (Cooke, J.) ("An expert witness, however, may assume liability for purposes of calculating damages."); *Sancom v. Quest Commc'ns Corp.*, 683 F. Supp. 2d 1043, 1068 (D.S.D. 2010) ("[I]t is well-settled that a damages expert . . . can testify as to damages while assuming the underlying liability.").

In any event, as a damages expert, Mr. Cook isn't qualified—and hasn't been called—to offer opinions about TCG's ownership structure. *See* Cook Dep. at 31:8 (noting Cook is an "economic damages expert"). He's just a consultant on "economics and financial issues, forensic accounting, and damages" who's qualified, by his training and experience, to offer opinions about *damages*. *Id.* at 6:1–2. He also (it goes without saying) has no personal knowledge of the facts and circumstances surrounding TCG's business relationship with either Inskeep or Baccus—so any testimony he might've offered on this question of ownership would (very likely) be inadmissible. *See United States v. Clay*, 832 F.3d 1259, 1315 (11th Cir. 2016) ("[Fed. R. Evid. 703] allows experts to base their opinions on 'facts or data' (1) that an expert has 'been made aware of or personally observed' or (2) that experts *in the particular field* would 'reasonably rely on.'" (emphasis added) (quoting FED. R. EVID. 703)). Most importantly, Cook later clarified, in his errata sheet, that his purported acknowledgement that Inskeep "owns the Consumer Group," Cook Dep. at 30:3–6, "is not an expert opinion but simply a factual statement based on [his] recollection of the K-1's in TCG's tax returns for 2011, 2012 and 2018," Cook Dep. Errata Sheet [ECF No. 112-4] at 1. That's really the end of that.

***

As we've indicated, Baccus can show that it owned TCG even without a valid stock certificate. "Courts often imply such agreements or contracts from the parties' acts and the surrounding circumstances." *In re Seminole Walls & Ceilings Corp.*, 446 B.R. 572, 585 (Bankr. M.D. Fla. 2011) (Jennemann, J.). In our case, as we've seen, those circumstances include (1) Inskeep's repeated

representations "that [TCG] was a wholly-owned subsidiary of Baccus Global," Powers Aff. ¶ 8; (2) evidence that "all expenses ever incurred on behalf of [TCG] have been paid by Baccus Global," *id.* ¶ 9; and (3) evidence that TCG was formed as a "holding company for trademarks used by Baccus Global," Lennon Dep. at 31:18–19. These facts—viewed in the light most favorable to Baccus—suggest that Inskeep may have directed the creation of the stock certificate only as a way of formalizing a corporate reality that, by then, had persisted for many years. Or they may suggest no such thing. The point, though, is that, when questions of ownership are this hotly disputed, our system rightly leaves their resolution to the jury at trial—not the judge at summary judgment. *See, e.g.*, *United States v. Samuell*, 2018 1886574, at *2 (S.D. Fla. Feb. 9, 2018) (King, J.) (denying summary judgment where the defendant's "ownership interest . . . in the subject property . . . [was] in dispute"); *Foley v. Wells Fargo Bank, N.A.*, 2012 WL 13085422, at *3 n.5 (S.D. Fla. July 20, 2012) (Dimitrouleas, J.) (denying summary judgment where there were "genuine issues of material fact regarding [the defendant'] ownership of [the plaintiff's] Note and Mortgage").

For all these reasons, we **DENY** the Plaintiffs' Motion for Summary Judgment.

## II.    Baccus's MSJ

Baccus moves for summary judgment on all ten of the Plaintiffs' claims. *See* Def.'s MSJ at 1. Baccus first asks for summary judgment as to Counts I, III, V, VII, and IX on the ground that TCG—through Inskeep—granted Baccus an exclusive license to use TCG's products through January 2, 2022. *Id.* at 2 ("The existence of such license, which Baccus raised in its Second Affirmative Defense and which Inskeep produced in discovery, eliminates The Consumer Group's Federal Trademark Infringement Claim under Count I, Federal False Designation of Origin Claim under Count III, Federal Unfair Competition Claim under Count V, Common Law Trademark Infringement Claim under Count VII and State Trademark Infringement Claim under Count IX."). Baccus next asks for summary judgment because (as to Counts II and X) Inskeep never registered the AUTOSTOP

name—either with the state or the federal government—and because (as to Counts IV, VI, and VIII) Inskeep never used that name in commerce. *See ibid.* ("Inskeep has no basis for the claims under Counts II, IV, VI, VIII and X as the 'AUTOSTOP' language has never been a registered trademark, [and] Inskeep's attempt to register the mark in August 2020 was based solely upon an alleged intent to use the mark (although in his Complaint he references Baccus' prior use)[.]"). Finally, Baccus asks for summary judgment on the Plaintiffs' request (in Counts I and II) for treble and statutory damages for any counterfeit products Baccus may have sold. *See id.* at 14–16; *see also* Compl. ¶ 70 (asking for treble and statutory damages for alleged violations of Count I); *id.* ¶ 90 (same for Count II). As to this last argument, Baccus says that the Plaintiffs have adduced no evidence that Baccus ever counterfeited anything. *See* Def.'s MSJ at 14–20. We'll take Baccus's arguments out of order.

### A.  We intend to dismiss the federal unfair-competition claims (Counts V and VI).

Before we get to the arguments Baccus *does* make, we must address one it hasn't. *Cf. Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1248 (11th Cir. 2015) (noting that a district court may "dismiss[ ] an action on its own motion" without notice "when amending the complaint would be futile"). In Counts V and VI, the Plaintiffs advance federal unfair-competition claims under the Lanham Act. But there's really no such thing. And, in any event, these claims are duplicative of the Plaintiffs' separate (but identical) claims for false designation of origin (Counts III and IV). We'll take these points in order.

*First*, a plaintiff "has no claim to a nonexistent federal cause of action for unfair competition." *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 908 (9th Cir. 2002); *see also* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:7 (5th ed. 2023) ("The courts have recognized that there is no federal statutory or common law of general unfair competition."). With respect to unfair competition, the Lanham Act is merely a "jurisdictional statute . . . [that] does not create the substantive right underlying the claim." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669

(Fed. Cir. 1988); *see also Royal Lace Paper Works, Inc. v. Pest-Guard Prods., Inc.*, 240 F.2d 814, 817 (5th Cir. 1957) ("[H]ad Congress intended to create an independent federal cause of action for unfair competition, it would . . . have directly said [it]."). [9] Instead, a plaintiff "is entitled to assert a cause of action under the Lanham Act for trademark infringement, 15 U.S.C. § 1114, or for false designation of origin, 15 U.S.C. § 1125, or it may assert state law claims for unfair competition." *Mattel*, 296 F.3d at 908 (cleaned up).

*Second*, the Lanham Act already incorporates "a cause of action for unfair competition through misleading advertising or labeling." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). Specifically, § 43(a) creates a civil cause of action against anyone who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or *any false designation of origin*, false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1) (emphasis added); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (Stevens, J., concurring) ("[U]nder [§ 43(a) of] the Lanham Act, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks . . . . Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical—is there a 'likelihood of confusion?'" (quoting *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979))). As Professor McCarthy has noted, we shouldn't be referring to this "false designation of origin" claim under the Lanham Act as an "unfair competition" claim:

> In modern cases one often encounters attorneys and judges in cases that allege infringement of an unregistered trademark or service mark brought under federal Lanham Act § 43(a)(1)(A), 15 U.S.C.[ ] § 1125(a)(1)(A), characterizing the case as one

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

for "unfair competition," not for infringement of an unregistered trademark or service mark. This usage is a remnant of the pre-1946 distinction between federally registered "trademarks" and unregistered "trade names" protected only under "unfair competition" law.

1 MCCARTHY § 4:6 (cleaned up); *see also Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 273 (E.D.N.Y. 2014) (dismissing "Plaintiff's unfair competition claim under the Lanham Act as duplicative of the Plaintiff's . . . false advertising claims under the statute").

And, indeed, our Complaint makes clear that the Plaintiffs' unfair-competition claims are duplicative of their false-designation-of-origin claims. In Counts V and VI, after all, the Plaintiffs allege that the "Defendant's acts, as alleged herein, constitute unfair competition, which is likely to cause *confusion*, mistake or *deception* in violation of *15 U.S.C. § 1125*." Compl. ¶ 116 (Count V) (emphases added); *id.* ¶ 121 (Count VI) (same). That, of course, is precisely what they say in Counts III and IV— their claims for false designation of origin. *See id.* ¶¶ 101–02 (Count III) ("[The Defendant] has marketed, advertised, sold, imported, or distributed its products so as to cause public *confusion* and *deception* . . . in violation of section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a).*" (emphases added)); *id.* ¶¶ 111–12 (Count IV) (same). And that's unsurprising because the language of Counts V and VI is lifted from § 43(a) of the Lanham Act, which prohibits anyone from engaging in any "false designation of origin" that's "likely to cause *confusion*, or to cause mistake, or to *deceive*[.]" 15 U.S.C. § 1125(a)(1) (emphases added).

The Eleventh Circuit has cautioned district courts against dismissing claims *sua sponte*. "A district court abuses its discretion when it dismisses an action sua sponte without 'provid[ing] the plaintiff with notice of its intent to dismiss or an opportunity to respond,' unless amendment 'would be futile' or 'the complaint is patently frivolous.'" *Brinson v. Welsh*, 709 F. App'x 582, 584 (11th Cir. 2017) (first quoting *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1335 (11th Cir. 2011); then quoting *Surtain*, 789 F.3d at 1248). Amendment is futile when no cause of action for the claim exists. *See, e.g.*, *Griffin v. General Mills, Inc.*, 634 F. App'x 281, 287 n.7 (11th Cir. 2015) ("[The Plaintiff] has no cause of action

. . . thus, the proposed amendment would be futile[.]"); *Compagnoni v. United States*, 173 F.3d 1369, 1371 (11th Cir. 1999) ("[T]he proposed amendment would be futile[ ] because. . . [the defendant] did not have a cause of action under [the statute]."). Nor must we proceed to trial with wholly duplicative claims. *See Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 n.1 (S.D. Fla. 2023) (Altman, J.) ("Because Count III's allegations reappear (essentially verbatim) in Count IV—and since Count III's cause of action is identical to the part of Count IV that's directed at the [the same defendant]— we now dismiss Count III as duplicative of Count IV." (cleaned up)); *Harrison v. Digital Health Plan*, 183 F.3d 1235, 1237 (11th Cir. 1999) ("We find no error in the district court's . . . dismissal of plaintiff's claim . . . as duplicative[.]"); *Trief v. Am. Gen. Life Ins. Co.*, 444 F. Supp. 2d 1268, 1270 (S.D. Fla. 2006) (Ungaro, J.) ("[I]t appears Plaintiff's allegations in count II amount to nothing more than a general allegation for breach of contract and are therefore duplicative of count III. Accordingly, the Court finds that count II must be dismissed." (cleaned up)).

Because Counts V and VI allege a non-existent cause of action—and because they're duplicative of Counts III and IV—we're inclined to dismiss them. Out of fairness to the Plaintiffs, however, we'll give them an opportunity to respond to our intent to dismiss Counts V and VI. *See Davken, Inc. v. City of Daytona Beach Shores*, 159 F. App'x 970, 973 n.1 (11th Cir. 2005) ("[A] dismissal based on a district court's conclusion that the suit lacks merit differs from a *sua sponte* dismissal based on a finding of frivolity." (citing *Jefferson Fourteenth Assocs. v. Wometco de P.R., Inc.*, 695 F.2d 524, 526 n. 3 (11th 1983))).

We therefore **NOTIFY** the Plaintiffs of our intent to **DISMISS** Counts V and VI. If the Plaintiffs oppose this dismissal, they must, **within 14 days**, file a response to this **ORDER**, explaining in detail why these counts should be allowed to proceed given what we've said here.

### B.     Counts II and X fail because Inskeep never registered the AUTOSTOP mark.

We likewise enter judgment against the Plaintiffs on Counts II and X because Inskeep never registered the AUTOSTOP mark—*either* in Florida *or* with the USPTO. Count II alleges that the "Defendant's actions constitute trademark infringement pursuant to 15 U.S.C. § 1114." Compl. ¶ 82. And Count X avers that Baccus violated FLA. STAT. § 495.141. *Id.* ¶ 152. But both statutes require the trademark-infringement plaintiff to show that he's registered the mark. *See, e.g., Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1021 n.1 (11th Cir. 1989) ("The Lanham Act infringement claim has no merit. [The plaintiff] has not registered its trademark under 15 U.S.C.[ ] §§ 1051–72, and consequently is not entitled to relief under 15 U.S.C.[ ] § 1114."); *Solid 21, Inc. v. Ulysse Nardin, USA Inc.*, 2019 WL 7933684, at *7 (S.D. Fla. Dec. 12, 2019) (Middlebrooks, J.) ("[A] plaintiff must register its mark with the State of Florida to have an actionable Florida statutory trademark infringement claim."). This rule flows naturally from the text of § 1114, which unambiguously provides that:

> Any person who shall, without the consent of the *registrant* . . . use in commerce any reproduction . . . of a *registered mark* in connection with the sale . . . of any goods or services on or in connection with which such use is likely to cause confusion . . . shall be liable in a civil action by the registrant[.]

15 U.S.C. § 1114 (emphases added). And the Florida statute is no less clear:

> [A]ny person who shall, without the consent of the *registrant* . . . [u]se any reproduction . . . of a mark *registered* under this chapter in connection with the sale . . . of any goods or services on or in connection with which such use is likely to cause confusion . . . shall be liable in a civil action by the owner of such *registered* mark[.]

FLA. STAT. § 495.131 (emphases added). Nor can we change the statutes' meanings to comport with Inskeep's theory of the case. *See* SCALIA & GARNER at 93 ("Nothing is to be added to what the text states or reasonably implies.").

Inskeep never even responds to this argument in his briefing—in fact, he *concedes* that the USPTO *denied* his registration application. *See* Pls.' Resp. MSJ at 9 ("[O]n March 15, 2016, Inskeep sought to register 'AUTOSTOP' as a trademark with the USPTO through [T]CG—a company wholly

owned by Inskeep—but was unsuccessful."); *see also* Def.'s SOF ¶ 19 ("AUTOSTOP is not and has never been registered on the primary registry of the [USPTO] (or in any other registry) on the application of Matthew [sic] Inskeep."); Pls.' Resp. SOF ¶ 19 ("Undisputed."). He's thus forfeited any argument he might've made to save these claims. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

Because Inskeep *admits* that he *never* registered the AUTOSTOP mark *either* with the federal or the state government, we **GRANT** Baccus's Motion for Summary Judgment on Counts II and X.

### C.  Counts I, III, VII, and IX survive and will proceed to trial.

In 2012, Inskeep executed a five-year agreement, by which he purported to license the use of TCG's trademarks to Baccus. *See* Compl. ¶ 28 ("On January 3, 2012, Baccus Global and The Consumer Group entered into a licensing agreement whereby Baccus Global [paid] The Consumer Group one million dollars to use The Consumer Group's trademarks for a five-year period." (cleaned up)); *see also* 2012 Licensing Agreement at 1 ("Licensor desires to transfer to Licensee . . . an exclusive license to manufacture and market goods using the trademark portfolio covered by the trademark rights where registered and used."). Inskeep represented both sides of that agreement because he was the managing member of *both* TCG *and* Baccus. *See* 2012 Licensing Agreement at 1 (displaying Inskeep's signature as both "licensor" and "licensee"). When this 2012 agreement was set to expire in

2017, Baccus's lawyer (Callie Hannan) prepared a new, nearly identical agreement, which she remembers "that Mr. Inskeep had signed." Hannan Aff. ¶¶ 8–9. But the reality is a bit more complicated than that. While Inskeep signed as managing member of TCG, he "did not date [TCG's] section of the draft agreement or sign and date the Baccus Global section of the draft agreement." Inskeep Aff. ¶ 7; *see also* 2017 Licensing Agreement [ECF No. 60-4] at 1 (showing only Inskeep's signature as "licensor").

Then, from 2017 until Inskeep's ouster in 2020, it's undisputed that "Baccus utilized the trademarks at issue herein with [TCG's] knowledge and authorization." Def.'s SOF ¶ 13; *see also* Pls.' Resp. SOF ¶ 13 (arguing that Baccus's "license to utilize the at-issue trademarks ended on February 13, 2020"). In the Plaintiffs' view, therefore, the 2017 licensing agreement isn't enforceable. *See* Pls.' Resp. MSJ at 2 ("As Inskeep chose not to execute the Unexecuted Draft 2017 License Document — evidenced by the fact that he did not finish executing same on behalf of either [TCG] or [Baccus], nor was there ever a schedule of the 'TRADEMARK PORTFOLIO' prepared or affixed to the 2017 License Document—[Baccus's] use of the trademarks following January 2, 2017, was pursuant only to an implied license."). Instead, the Plaintiffs say, the parties' course of conduct starting in 2017 created an *implied* licensing agreement, which Inskeep then terminated when he was ousted from Baccus's management team in 2020. *See* Pls.' Resp. SOF ¶¶ 35–36 ("[Baccus's] use of any trademarks owned by Inskeep or [TCG] . . . was pursuant only to Inskeep's permission and an express and/or implied license by Inskeep . . . [which] ended on February 13, 2020, when purported members of [Baccus] wrongfully sought to oust Inskeep."); Inskeep Aff. ¶ 23 ("Baccus Global's use of any trademark owned by me individually or by my wholly-owned company Consumer Group . . . is pursuant only to my permission and an express and/or implied license by me.").

Baccus contends that the parties didn't need an implied licensing agreement because the Plaintiffs were bound by the 2017 License Agreement Inskeep signed. *See* Def.'s MSJ at 9 ("[I]t would

strain credulity to conclude that Inskeep was not in full agreement with the license provision where he signed on behalf of the licensor entity and may have left the other signature line blank, but then acted in every way as if the license continued in force."). When we take the facts in the light most favorable to the Plaintiffs, however, we think there's enough "evidence [to] lead a reasonable jury to find for [the Plaintiffs]." *Anderson*, 477 U.S. at 248.

Under Florida law, "a contract not signed by all of the parties, but otherwise valid, may be upheld against a signing party, unless the nature or the wording of the contract indicates that his signature was conditioned upon all other parties signing the contract, *or* he can prove by parol evidence that when he signed the contract he made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties signed it." *Skinner v. Haugseth*, 426 So. 2d 1127, 1131 (Fla. 2d DCA 1983) (emphasis added); *see also Hunter v. Tartan Const. Co.*, 522 So. 2d 77, 77 (Fla. 4th DCA 1988) ("[T]he guaranty was not conditional upon all other parties signing it."). There are, in short, two ways in which a contract that wasn't signed by all parties *won't* bind the signing party: (1) where the contract requires the signature of all parties; and (2) where the signing party (here, Inskeep for TCG) made it known to the other party (here, Baccus) that he only intended to be bound if *all* parties signed. The Plaintiffs arguably meet both exceptions.

*First*, the 2017 agreement says that "the *parties* have caused this Agreement to be executed by *their duly authorized officers* on the respective dates hereinafter set forth." 2017 Licensing Agreement at 1 (emphases added). The contract itself therefore makes clear that the "parties" (plural) would cause "their duly authorized officers" (again, plural) to "execute"—that is, sign, *see Execute*, *Black's Law Dictionary* (11th ed. 2019) ("To make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form.")—the contract. Since only one party (singular) caused its duly authorized officer (singular) to sign the contract, the contract's own internal enforcement mechanism *may* not have been triggered. *See* SCALIA & GARNER at 167 ("[C]ontext is a primary determinant of

meaning."); *see also United States ex rel. Office Gap, Inc. v. Cin. Ins. Co.*, 2020 WL 5938774, at *3 (S.D. Fla. Oct. 7, 2020) (Rosenberg, J.) (holding that the contract "manifest[ed] an intent that [one party] would not be bound unless [the other party] also signed" because the contract "provided[:] 'This document and all other documents requested in this contract, must be signed and returned within 7 days of receipt in order to become contractual'" (cleaned up)). Especially in the context of contracts—which must be entered into by more than one party—we think that the License Agreement's use of the plural form evinces a clear intention to bind both sides *only if* both sides have signed.

*Second*, and in any event, the Plaintiffs have adduced enough parol evidence for their view that Inskeep "made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties signed it." *Skinner*, 426 So. 2d at 1131. Parol evidence is "extrinsic evidence . . . made before or at the time of the [creation of the] instrument in question." *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485 (Fla. 1957). And Inskeep has, in sworn testimony, given a perfectly reasonable explanation for the Plaintiffs' side of this story. "[O]n behalf of both Baccus Global and Consumer Group," he's explained, "I decided not to enter into the agreement" because it was deficient in several salient ways—for example, it lacked "any exhibit indicating the contents of the trademark portfolio." Inskeep Aff. ¶¶ 4–5. When he noticed these deficiencies, Inskeep "ceased execution, had zero intent to be bound, and put the draft agreement aside." *Id.* ¶ 8. And, because he "was the only intended signatory, as managing member of both Baccus Global and [TCG], all relevant parties were fully aware that the draft agreement with [his] signature was no more than 'garbage.'" *Id.* ¶ 9. That's pretty strong parol evidence—*i.e.*, "extrinsic evidence of prior or contemporaneous statements," *Prod. Mktg., L.L.C. v. Commodity Credit Corp.*, 108 F. Supp. 2d 1294, 1304 (M.D. Ala. 2000)—for Inskeep's view that he "made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties signed it," *Skinner*, 426 So. 2d at 1131.

The Plaintiffs also have a reasonable explanation for Baccus's *other* main contention—that, by their course of dealing with Baccus, the Plaintiffs evinced their intention to be bound by the 2017 License Agreement. *See* Def.'s MSJ at 8 ("There is no indication anywhere that The Consumer Group expressed an intention to not be bound and the conduct of the parties clearly establishes an intent to carry forward the license agreement."). Baccus, the Plaintiffs tell us, used the trademarks "pursuant only to Inskeep's permission and an express and/or implied license by Inskeep." Pls.' Resp. SOF ¶ 35. Whether any of this is true—whether, in short, Inskeep purposefully left the Baccus signature blank because he intended *not* to be bound by the licensing agreement, whether the parties then entered into an *implied* licensing agreement, and whether Inskeep properly terminated that implied agreement when he was ousted in 2020—are all fact questions best left for the jury to decide. For now, then, we **DENY** Baccus's Motion for Summary Judgment as to Counts I, III, VII, and IX.[10]

### D. We strike the Plaintiffs' Request for Counterfeit Damages (Parts of Counts I and II)

In Counts I and II of the Complaint, the Plaintiffs asked for treble and statutory damages flowing from Baccus's (alleged) counterfeit use of the Plaintiffs' marks.[11] *See* Compl. ¶ 70 ("The Consumer Group is entitled to recover treble damages and statutory damages for each product advertised, marketed, and/or sold by Defendant that incorporates or utilizes a trademark owned by The Consumer Group."); *id.* ¶ 90 (same as to Inskeep and the AUTOSTOP mark). In its motion, Baccus argues that its "use of The Consumer Group's trademarks following the purported termination

---

[10] In Count V, TCG advances a non-existent unfair-competition claim that, as we've highlighted (*see ante*, at 30–33), is duplicative of the false-designation-of-origin claim TCG advances in Count III. We've already signaled our intent to dismiss Count V—*both* because it's duplicative of Count III *and* because it asserts a non-existent cause of action. We add here only that, if the Plaintiffs manage to convince us to keep Count V, we'd deny Baccus's request for summary judgment on that count for the same reasons we, in this Section, denied Baccus's summary-judgment request as to Count III.

[11] We've already granted Baccus's Motion for Summary Judgment on Count II. *See ante*, at 34–35. We add here only that, even if we hadn't, we'd still strike Inskeep's request for treble and statutory damages as to that count.

of its undisputed license does not constitute use of a 'counterfeit mark,'" which, it claims, is necessary for enhanced damages. Def.'s MSJ at 17. According to Baccus, "other district courts within the Eleventh Circuit have 'uniformly agreed' that hold-over use following termination of a license does not constitute use of a counterfeit mark." *Ibid.* (first citing *GP Brands, Inc. v. Williams*, 2016 WL 4545522, at *5 (M.D. Fla. Aug. 11, 2016) (Wilson, Mag. J.), *report and recommendation adopted*, 2016 WL 4536180 (M.D. Fla. Aug. 30, 2016) (Whittemore, J.); and then citing *Choice Hotels Int'l, Inc. v. Mohan*, 2010 WL 11561573, at *8 (N.D. Ala. Oct. 29, 2010)). Baccus also contends that it never used a "counterfeit mark"—*both* because the TCG marks weren't "in actual use by [someone] other than the defendant at the time of the defendant's use," *id.* at 18 (first citing *United States v. Guerra*, 293 F.3d 1279, 1290 (11th Cir. 2002); and then citing *United States v. Foote*, 413 F.3d 1240, 1248 (10th Cir. 2005)), *and* because it didn't "'intentionally' us[e] a mark 'knowing' that such mark is a counterfeit mark," *id.* at 19 (quoting 15 U.S.C. § 1117(b)(1)).

Whatever the merits of these arguments, the Plaintiffs elected not to respond to them. *See generally* Pls.' Resp. MSJ. Indeed, the Plaintiffs never even mentioned their counterfeiting claims—or their request for treble and statutory damages—in their Response MSJ. They've thus forfeited any argument they could've made in support of these requests. *See Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sappupo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief . . . are deemed waived.").

We therefore **GRANT** Baccus's Motion for Summary Judgment as to the Plaintiffs' requests

for treble and statutory damages in Counts I and II.

      E.     **Counts IV and VIII fail because Inskeep never used the AUTOSTOP mark in commerce and because he cannot show a likelihood of confusion.**

      Inskeep's trademark claim—that *he personally* owns the AUTOSTOP mark and that Baccus infringed on that mark—is simply not close. Indeed, on this claim, every fact and (just about) every consideration weighs decisively against Inskeep.

      Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition by prohibiting the use in interstate commerce of any 'word, term, name, symbol or device, . . . or any false designation of origin . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.'" *Tana v. Dantanna's*, 611 F.3d 767, 772–73 (11th Cir. 2010) (quoting 15 U.S.C. § 1125(a)).

      To prevail on a trademark-infringement claim, "a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (quoting *Tana*, 611 F.3d at 773).[12] Inskeep has failed to create a genuine dispute of material fact as to either element.

---

[12] These are the same two elements Inskeep would need to prove for his common law trademark-infringement claim (Count VIII), *see Natural Answers, Inc. v. SmithKline Beecham Corp.*, 2005 WL 8166086, at *3 (S.D. Fla. Feb. 7, 2005) (Ungaro, J.) ("The elements for a federal unfair competition claim and a common law unfair competition claim are virtually the same as those for a trademark infringement claim under 15 U.S.C. § 1125." (citing *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1475 n.3 (11th Cir. 1991) (cleaned up)))—which is why we analyze both counts together here. For what it's worth, Baccus agrees that the two claims require proof of the same elements—and that, therefore, these two counts should be analyzed together. *See* Def.'s MSJ at 11 ("As to Count VIII's claim asserting

### i. The first element: rights to the mark

Inskeep has failed to show that he has any rights at all to the AUTOSTOP mark. "Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080–81 (11th Cir. 2016) (quoting *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)).[13] In this case, it's (basically) undisputed that Baccus used the AUTOSTOP mark in commerce first. *See* Lennon Aff. ¶ 9 ("Baccus Global had extensively used and promoted the 'AUTOSTOP' mark . . . well prior to the August 25, 2020 filing date of Inskeep's application."); Inskeep 30(b)(6) Dep. at 124:25–125:5 ("Q. Did you believe that AutoStop was used by Baccus Global for a number of years prior to 2020? A. I believe it was."). We say *basically* undisputed because Inskeep does advance three arguments for his position that *he* used the mark in commerce—all unpersuasive.

*First*, he says that "all of Baccus Global's customers and distributors were Inskeep's customers and distributors." Pls.' MSJ Response at 8. Three problems with this.

*One*, Inskeep has produced *no evidence* that he—not Baccus—ever used the mark in commerce (much less that he used it before Baccus did). *See generally* Pls.' Resp. MSJ. And a party needs *evidence* to survive summary judgment. *See, e.g.*, *Harrell v. City of Opa-Locka*, 2022 WL 898565, at *20 (S.D. Fla.

---

common law trademark infringement, the same analysis would be applicable."). And Inskeep (notably) never suggests otherwise. *See generally* Pls.' Resp. MSJ.

[13] "To satisfy the first element of § 43(a)—proof of a valid trademark—a plaintiff need not have a registered mark. We have recognized that 'the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source.'" *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir. 1984) (cleaned up); *see also Matal v. Tam*, 582 U.S. 218, 225 (2017) ("[E]ven if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement."). That's why Inskeep (at least theoretically) can assert a trademark-infringement claim (as he does in Count IV) over a mark he never registered. And that, of course, is what distinguishes Count IV (brought under § 43(a) of the Lanham Act, 15 U.S.C. § 1125) from Count II, brought under 15 U.S.C. § 1114—which, as we've detailed, only applies to *registered* marks.

Mar. 28, 2022) (Altman, J.) ("[A]t summary judgment, a plaintiff must produce evidence to support her contentions.").

*Two*, Inskeep's claim that Baccus's use was actually *his* use ignores a basic tenet of corporate law. An LLC is "an autonomous legal entity, separate and distinct from its members," *Palma v. S. Fla. Pulmonary & Critical Care, LLC*, 307 So. 3d 860, 866 (Fla. 3d DCA 2020) (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1117 (Fla. 1984)), with its own rights, possessions, and obligations. And a person cannot pierce the corporate veil by simply declaring, without a shred of evidence, that he and the entity are (and have always been) indistinguishable. *See Robertson-Ceco Corp. v. Cornelius*, 2007 WL 1020326, at *6 (N.D. Fla. Mar. 30, 2007) (Vinson, J.) ("[S]ummary judgment should not be granted against [the defendant] unless there is a *specific showing* that she was the alter ego of [her corporation] *and* that she engaged in the improper conduct." (emphasis added)).

*Three*, a party's "first use in commerce" must be a public use. *See Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F. App'x 785, 799 (11th Cir. 2016) ("The party claiming a right must present 'evidence showing first, adoption, and second, use in a way *sufficiently public* to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" (quoting *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1321 (11th Cir. 2011) (cleaned up))); *see also* Eleventh Circuit Pattern Jury Instructions (Civil Cases) § 10.2 (2022) ("Use is sufficient to establish rights if it is public enough that it identifies the goods in question as those *of the person using the trademark*." (emphasis added)). Again, Inskeep has produced no picture, advertisement, marketing pamphlet, invoice, receipt, package slip, commercial, or product that has *ever* identified the AUTOSTOP mark—or any good bearing that mark—as belonging to *him*. This omission is fatal to his claim. *See, e.g.*, *Thoroughbred Legends, LLC v. The Walt Disney Co.*, 2008 WL 616253, at *5 (N.D. Ga. Feb. 12, 2008) (rejecting a trademark-infringement claim where the "Plaintiffs fail[ed] to show that the alleged . . . mark was in fact ever used to signify origin to customers and competitors" (emphasis

omitted)).

*Second*, Inskeep's widow—now substituted in as the Plaintiff—claims that, "after Inskeep's death in March[ ] 2022, [T]CG, through its now sole member, Jennifer Inskeep, as personal representative of the Estate of Mathew Inskeep, working as [T]CG's managing member, has used the trademarks and commercialized same." Pls.' Resp. MSJ at 3 (citing Pls.' Resp. SOF ¶¶ 38–40). But paragraphs 38 and 39 of the Plaintiffs' Response Statement of Facts tell us only that Mr. Inskeep died and that Mrs. Inskeep, as personal representative of her deceased husband's estate, substituted in as the Plaintiff in this case. *See* Pls.' Resp. SOF ¶¶ 38–39. So, the only relevant paragraph for this critical piece of evidence is 40, which refers us to the very last line of Mrs. Inskeep's affidavit, where she says that, since her husband's death, she's "been selling direct to consumer jump starter, invertor, and lighting products, as the sole managing member of The Consumer Group LLC." Affidavit of Jennifer Inskeep ("Mrs. Inskeep Aff.") [ECF No. 114-6] ¶ 9.

Three problems with this. *One*, she attaches no evidence to this affidavit, and we're having some trouble understanding what she's talking about here. She never tells us—even though she's represented by competent counsel—that the things she's selling bear the AUTOSTOP mark. And (again) it was her burden, in responding to Baccus's properly supported claim that it's been using the AUTOSTOP mark since 2019, to adduce evidence for her view that she, too, has been using that mark. *See, e.g.*, *Harrell*, 2022 WL 898565, at *20 ("[A]t summary judgment, a plaintiff must produce evidence to support her contentions.").

*Two*—and in any event—Mrs. Inskeep ignores the basic rule of trademark law, which is that "[r]ights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA*, 838 F.3d at 1080–81 (quoting *Hana Financial*, 574 U.S. at 419). Mrs. Inskeep's "direct to consumer" sales since her husband's death (which happened in 2022, years into this litigation) thus fail to save her claims given

Baccus's evidence that it's been using the mark continuously since 2019. *See, e.g.*, Lennon Aff. ¶ 9 ("Baccus Global has used the 'AUTOSTOP' mark since at least as early as October 19, 2019.").

*Three*, and most importantly, Mrs. Inskeep's affidavit is clear that she sold her products—whatever they were—only in her role "as the sole managing member of The Consumer Group LLC." Mrs. Inskeep Aff. ¶ 9. Again, however, she and TCG aren't one and the same. *See, e.g.*, *Palma*, 307 So. 3d at 866 ("A limited liability company is an entity distinct from its members." (quoting FLA. STAT. § 605.0108(1))). And, even if she were, she and her deceased husband aren't one and the same—and she's produced no evidence for the proposition that, even ignoring the fact that she made sales only through TCG, those sales were made *in her capacity as the personal representative of her husband's estate*. Without any such evidence, of course, her own personal sales—just like any sales she may have made through TCG—aren't the sales of the Plaintiff asserting the claims in Counts IV and VIII (*i.e.*, Mathew Inskeep's estate). *See Estate of Morales ex rel. Morales v. Iasis Healthcare Group*, 901 So. 2d 965, 966 (Fla. 2d DCA 2005) ("[T]he estate and its survivors are the real parties in interest, and the personal representative is merely a nominal party." (first citing *DeVaughn v. DeVaughn*, 840 So. 2d 1128, 1132 (Fla. 5th DCA 2003); and then citing *Fla. Emergency Physicians v. Parker*, 800 So. 2d 631, 633 (Fla. 5th DCA 2001))).

*Third*, Inskeep (while he was alive) suggested that he tried to register the AUTOSTOP name with the USPTO. *See* Pls.' Resp. MSJ at 9 ("Inskeep sought to register 'AUTOSTOP' as a trademark with the USPTO through [TCG]—a company wholly owned by Inskeep—but was unsuccessful."). Two issues here.

*One*, the record evidence refutes Inskeep's claim that *he* sought to register the AUTOSTOP name with the USPTO in 2016. In fact, it's undisputed that TCG—not Inskeep—applied to the USPTO for the registration. *See* Def.'s SOF ¶ 17 ("On March 15, 2016, [TCG] sought to register 'AUTOSTOP' as a trademark." (citing Lennon Aff. ¶ 10)); Pls.' Resp. SOF ¶ 17 ("Undisputed."); *see*

*also* Def.'s SOF ¶ 18 ("The [USPTO] denied *The Consumer Group's* application to trademark the 'AUTOSTOP' language[.]" (emphasis added) (citing Lennon Aff. ¶ 11)); Pls.' Resp. SOF ¶ 18 ("Undisputed."). It was only *after* his departure from Baccus in 2020 that Inskeep sought to register AUTOSTOP under his own name. *See* Def.'s MSJ at 10 ("[I]nskeep has never sought to exercise any personal rights relating to 'AUTOSTOP' prior to the dispute arising with Baccus Global which led to his removal from the management of Baccus Global in February 2020."); *see also* AUTOSTOP Registration Application at 1 (noting August 25, 2020, as the filing date). And, as we've established, TCG and Inskeep just aren't the same thing.

*Two*—and in any event—Inskeep has cited no case (and we haven't found any) for the novel proposition that a plaintiff's unsuccessful *attempt* to register a trademark with the USPTO, without more, qualifies as "use in commerce." By failing to cite any legal authority for this position, he's forfeited any such argument. *See Sappupo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

Inskeep thus hasn't produced any evidence for his *personal* ownership of the AUTOSTOP mark—which is essential to his claims in Counts IV and VIII.

### ii.  The second element: likelihood of confusion

Nor has Inskeep created a genuine dispute of material fact on the issue of confusion. "We have recognized seven factors to be considered as to the likelihood of confusion: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008) (citing *Frehling Enters. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)). "Of these, the type of mark and the

evidence of actual confusion are the most important." *Frehling*, 192 F.3d at 1335. All but one of these factors weigh against Inskeep here.

Starting with the (less important) middle factors, it's undisputed that the AUTOSTOP mark Baccus has been using is the same mark Inskeep now claims to own, so the second factor ("similarity of mark") favors Inskeep. But the remaining factors all lean heavily for Baccus. Inskeep has produced no evidence that he's ever sold the product *himself*—that is, outside of TCG or Baccus—so he cannot show any "(3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; [or] (5) similarity of advertising media[.]" *Aronowitz*, 513 F.3d at 1239. Indeed, even if we were to credit Mrs. Inskeep's contention that, since her husband's death, she's been selling some of the products herself, Counts IV and VIII would still fail because she's adduced no evidence that her products are *similar* to the ones Baccus sold, that her retail outlets are similar to Baccus's, or that she uses similar advertising media. *See generally* Pls.' Resp. MSJ; *see also* Mrs. Inskeep Aff. ¶ 9 (stating only that she has been "selling direct to consume jump starter, invertor, and lighting products").

As for Baccus's intent—the sixth factor—Baccus *believed* that it was using the mark pursuant to a licensing agreement (whether express or implied) with TCG. *See* Def.'s MSJ at 19 ("Baccus was of the belief that it has a continuing exclusive license to use The Consumer Group's trademarks at issue through January 2, 2022 (citing Def.'s SOF ¶¶ 3–12)); Pls.' Resp. MSJ at 9 ("Following the unsuccessful 2016 application with the USPTO, Inskeep . . . allowed Baccus Global to utilize 'AUTOSTOP' through an implied license."). There's therefore no evidence that Baccus used the marks with anything resembling a nefarious intent. *See Gibson v. Resort At Paradise Lakes, LLC*, 2018 WL 10373435, at *9 (M.D. Fla. Feb. 2, 2018) (Honeywell, J.) (finding that this factor favored the defendants because they "believed [that they were] authorized to use the subject images for advertising").

Nor has Inskeep moved the needle on the most important factors (type of mark and actual

confusion). Starting with confusion, Inskeep has produced *no evidence* that any consumer was *ever* confused about the source of the AUTOSTOP mark. The two most common forms of confusion evidence are (1) surveys and (2) the declarations of actual (confused) consumers. Inskeep has given us neither. And it was unquestionably his burden to show that consumers were confused. *See, e.g.*, *Am. Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 624 (5th Cir. 1963) ("The burden was on plaintiff in the first instance to show confusing similarity between the marks in question.").

Finally, Inskeep has failed to show that the type-of-mark factor weighs in his favor. "There are four recognized types of mark, ranging from weakest to strongest: generic, descriptive, suggestive and arbitrary." *Aronowitz*, 513 F.3d at 1239. Here's how the Eleventh Circuit has defined these phenotypes:

> 1) generic—marks that suggest the basic nature of the product or service; 2) descriptive marks that identify the characteristic or quality of a product or service; 3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and 4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks.

*Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 797–98 (11th Cir. 2003).

In 2016, the USPTO denied TCG's application to register the AUTOSTOP mark because the examiner found that the term was merely descriptive.[14] *See* Allison Holtz, *Office Action (Official Letter) About Applicant's Trademark Application*, USPTO (June 6, 2016), available at

---

[14] The parties forgot to attach a copy of the USPTO's Office Action Letter. It was supposed to be appended to Lennon's Affidavit, *see* Lennon Aff. ¶ 11 ("A copy of the Office Action Letter is attached hereto as Exhibit B."), but it doesn't appear there. Fortunately, we've found the Action Letter on the USPTO's official webpage, and we'll take judicial notice of it here—it being "a fact that is not subject to reasonable dispute because it: . . . (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. Inskeep (in any event) never disputes *either* that the USPTO denied TCG's application *or* that it found the AUTOSTOP mark merely descriptive. *See* Pls.' Resp. MSJ at 9 ("Inskeep sought to register 'AUTOSTOP' as a trademark with the USPTO through [TCG] . . . but was unsuccessful.").

http://tinyurl.com/mshhxnhy. Specifically, the USPTO determined that "an automatic shutoff, or 'auto stop' is a desirable feature of goods like applicant's goods." *Ibid*. Because "[t]he applied-for mark merely describe[d] a feature of applicant's goods," the USPTO denied the application. *Ibid*. We agree with the USPTO that AUTOSTOP is merely a descriptive mark.

The Trademark Manual of Examining Procedure ("TMEP") defines a descriptive mark as one that "describes an ingredient, quality, characteristic, function, feature, purpose, or use of an applicant's goods and/or services." TMEP § 1209.01(b); *see also In re TriVita, Inc.*, 783 F.3d 872, 874 (Fed. Cir. 2015) ("A mark is merely descriptive if it 'consist[s] merely of words descriptive of the qualities, ingredients or characteristics of' the goods or services related to the mark." (quoting *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173 (Fed. Cir. 2004))). That's consistent with the Eleventh Circuit's view of a descriptive mark as one that "identif[ies] the characteristic or quality of a product or service[.]" *Gift of Learning Foundation*, 329 F.3d at 797. Inskeep suggests that "AUTOSTOP is distinct, imaginative, and valuable, in part, for its inherently fanciful and suggestive nature." Pls.' Resp. MSJ at 5 (cleaned up). But, because the AUTOSTOP products automatically shut off—that is, they *auto*-stop—the name simply describes a feature of the products themselves. *See* Inskeep Aff. ¶ 17 ("I developed 'AUTOSTOP' to assist buyers and end-users in understanding any features on products whereby the user could set the desired pounds per square inch ('PSI') on a product and the product would automatically stop at the set PSI without the user needing to monitor the inflation process."). That's sufficient to render the mark descriptive. *See Gift of Learning Foundation*, 329 F.3d at 797 (defining a descriptive mark as one that merely "identif[ies] the characteristic or quality of a product or service").

"Marks which are merely descriptive of a product are not inherently distinctive." *Two Pesos*, 505 U.S. at 769. In other words, "[w]hen used to describe a product, they do not inherently identify a particular source, and hence cannot be protected." *Ibid*.; *see also Tana*, 611 F.3d at 774 (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007) ("Generic marks, on the other hand, are

generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act.").[15] Still, "[d]escriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark protection by acquiring 'secondary meaning.'" *Tana*, 611 F.3d at 774 (quoting 15 U.S.C. § 1052(f)); *see also Dieter v. B & H Inds. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) (affirming "[t]he trial court's finding that [the plaintiff's] mark lacked secondary meaning relates to factor one, the type of mark"). "A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Welding Services*, 509 F.3d at 1358 (cleaned up). But the "Plaintiff has the burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term." *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991). And "[t]his requisite high degree of proof must be considered by the court when ruling on a motion of summary judgment." *Ibid.*

"[S]urvey evidence 'is the most direct and persuasive evidence' to establish secondary meaning." *Vital Pharms., Inc. v. Am. Body Bldg. Prod., LLC*, 511 F. Supp. 2d 1303, 1311 (S.D. Fla. 2007) (Middlebrooks, J.) (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999)); *see also Habersham Plantation Corp. v. Art & Frame Direct, Inc.*, 2011 WL 4005454, at *6 (S.D. Fla. Sept. 8, 2011) (Cohn, J.) ("Establishing secondary meaning is best accomplished by surveys or other quantitative evidence."); *Sec. Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1301 (5th Cir. 1985) ("[T]he authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning."). That's because this question—"whether 'the primary significance' of the trademark 'is to identify the source of the product rather than the product itself'—is a deeply empirical one." *Vital*

---

[15] By contrast, "[s]uggestive and arbitrary or fanciful marks are deemed 'inherently distinctive' because 'their intrinsic nature serves to identify a particular source of a product' and are generally entitled to trademark protection." *Tana*, 611 F.3d at 774 (quoting *Two Pesos*, 505 U.S. at 768).

*Pharms., Inc. v. Monster Energy*, 553 F. Supp. 1180, 1253 (S.D. Fla. 2021) (Altman, J.) (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)). As we've said, Inskeep has produced no survey evidence at all. Without a survey, we're left only with *indirect* evidence of how consumers *might* perceive the AUTOSTOP mark. Inskeep's failure to present survey evidence thus weighs heavily against his claim to secondary meaning. *See, e.g.*, *Vital Pharms.*, 511 F. Supp. 2d at 1311 (finding no secondary meaning, in part, because "VPX presented no survey evidence at trial indicating that its Redline product had acquired secondary meaning in the minds of consumers"); *Yankee Candle Co. v. Bridgewater Candle Co.*, LLC, 259 F.3d 25, 39 (1st Cir. 2001) (affirming the district court's finding of no secondary meaning, in part, because the plaintiff "failed to introduce any survey evidence").

In the absence of a consumer survey, courts in this Circuit consider the following four factors to determine whether a trademark has acquired secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff; and (4) the extent to which the public actually identifies the name with the plaintiff's service. *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir. 1984) (cleaned up)).

Inskeep falters on all four factors. As we've indicated, he (personally) has *never* used the mark in commerce—only Baccus, pursuant to its contract with TCG, has. Pls.' ROG Resps. at No. 2 (answering that "'AUTOSTOP' is currently used in commerce in relation to Baccus Global's [products]" in response to an interrogatory asking Inskeep to identify any uses of the challenged trademarks "by any individual business entity or organization *other than* Baccus Global" (emphasis added)). And he's produced no evidence for the remaining three factors: (2) the nature and extent of any advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff; and (4) the extent to which the public actually identifies the name with the plaintiff's service. *See generally* Pls.' Resp. MSJ.

Trying to excuse this glaring omission, Inskeep advances two arguments—both unavailing. *First*, he says that Baccus failed to "submit any evidence whatsoever regarding the lack of secondary meaning." *Id.* at 5. In saying so, of course, Inskeep just mixes up the standard. The law is clear that the "*Plaintiff* has the burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term." *Investacorp*, 931 F.2d at 1525 (emphasis added). Having failed to meet that burden here, Inskeep cannot prevail. *Second*, Inskeep complains of a "substantial inability to use the AUTOSTOP trademark given this litigation and the litigation surrounding the ouster of Inskeep as [m]anaging member of [Baccus Global] in February 2020." Pls.' Resp. SOF ¶ 40. Again, however, it was Inskeep's burden to prove "a secondary meaning for a descriptive term." *Investacorp*, 931 F.2d at 1525. That there may be reasons for his lack of proof doesn't, at summary judgment, excuse the fact that he has no proof of secondary meaning. In any event, Inskeep wasn't ousted from Baccus until 2020, *see* Inskeep Aff. ¶ 24 ("[O]n February 13, 2020 . . . purported members of Baccus Global wrongfully sought to oust me."), and he didn't file this lawsuit until later that same year, *see, e.g.*, Compl. at 30 (filed on November 19, 2020). But it's undisputed that the AUTOSTOP mark has been used in commerce since "at least as early as October 19, 2019." Lennon Aff. ¶ 9; *see also* Inskeep 30(b)(6) Dep. at 124:25–125:2 ("Q. Did you believe that AutoStop was used by Baccus Global for a number of years prior to 2020? A. I believe it was."); Pls.' Resp. MSJ at 10 ("[Baccus] has sold products containing the 'AUTOSTOP' terminology since 2019 pursuant to an implied license."). So, there was plenty of time before the 2020 ouster for Inskeep to have acquired some secondary meaning in the AUTOSTOP mark—if, as he now claims, he had developed any priority rights to that mark during those years.

Because Inskeep has failed to show that he has any ownership rights in the AUTOSTOP mark—indeed, because he's failed to prove almost anything at all about people's conception of that

mark—we **GRANT** Baccus's MSJ on Counts IV and VIII.[16]

**CONCLUSION**

After careful review, we **ORDER AND ADJUDGE** that the Plaintiffs' Partial MSJ [ECF No. 106] is **DENIED** and the Defendant's MSJ [ECF No. 103] is **GRANTED in part and DENIED in part** as follows:

1) The Defendant's MSJ is **GRANTED** as to those parts of Counts I and II that sought treble or statutory damages because of Baccus's alleged counterfeiting;

2) The Defendant's MSJ is **GRANTED** as to Counts II and X because Inskeep never registered the AUTOSTOP mark;

3) The Defendant's MSJ is **GRANTED** as to Counts IV, VI, and VIII because Inskeep has no ownership rights over the AUTOSTOP mark; and

4) The Defendant's MSJ is **DENIED** as to Counts I, III, V, VII, and IX.

5) As to Counts V and VI, we intend to dismiss those counts—*both* because they're duplicative of Counts III and IV *and* because they assert non-existent causes of action. If the Plaintiffs oppose this dismissal, they must file a response, explaining in detail why those counts should not be dismissed, by **February 16, 2024**.

**DONE AND ORDERED** in the Southern District of Florida on February 2, 2024.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

---

[16] In Count VI, Inskeep also asserts an unfair-competition claim based on Baccus's use of the AUTOSTOP mark. We've already signaled our intent to dismiss that claim—*both* because it's duplicative of Count IV *and* because it advances a non-existent cause of action. *See ante*, at 30–33. We add here only that, even if we don't end up dismissing that count, we would still grant Baccus's request for summary judgment on it for the same reasons we enter judgment here on Count IV—*viz.*, that Inskeep never used the AUTOSTOP mark in commerce and cannot show a likelihood of confusion.